## CITY OF BOSTON *vs.* THOMAS RICHARDSON.

By the ordinance of 1647, flats on the sea shore, not previously granted to individuals, nor appropriated to public uses, although within the bounds of a town already established, passed to the proprietor of the adjoining upland.

A grant by a town, since the ordinance of 1647, of the land next tide water on either side of a street, bounded "with the street" and "the bay," passed the fee in the soil of the street and in the flats in front thereof.

A grant from the colony of Massachusetts to the town of Boston, before the passage of the ordinance of 1647, of flats at the end of a street, the title in the soil under which street had been granted by the town to the abutters thereon between 1639 and 1645, cannot be presumed from orders of the town at different times from 1643 to 1652, granting liberties to wharf, establishing landing places and highways, and providing for the erection and maintenance of fortifications, upon flats in other places; from successive orders of the town in 1673–4, granting to the abutter on one side of the street "liberty to wharf before his own land in proportion with other men," reciting that he had staked out part of his wharf "before the town's ground and highway adjoining to his land," and directing him not to proceed to wharf there without the consent of the selectmen, granting liberty to a person to whom he "hath sold the privilege of said flats" to wharf a certain breadth thereon, and granting liberties to the owners of lands next beyond to wharf in front thereof, and to the abutter on the other side of the street "to wharf in proportion with his neighbors;" from an order of the selectmen in 1683, "staking out for the town's use" the same street "on the side of the land" of the first abutter, and another street leading from the first street along the shore, and purporting to grant to the abutters on the second street the flats and land between it and the sea in proportion to their fronts thereon upon condition that they should repair this street; and from the repetition of this condition in an order of the town in 1736 reducing the width of this street.

Licenses more than sixty years old, produced from the proper custody, purporting to show the exercise of ownership of land, are admissible in proof of the licensor's title, in con-

nection with evidence of actual enjoyment in accordance with it, without direct **proof of** possession of the licensee under them.

Evidence of the maintenance by a town or city of a fish-house and engine-house at the end of a highway next the sea, and of its repairing a capsill resting on a stone wall at the head of the dock, is competent to show a disseisin by the city, at least to the extent occupied by the buildings.

On the trial of a writ of entry brought by the city of Boston to recover a parcel of flats five hundred feet long, lying at the end of a highway, and bounded by prolongations of the side lines thereof, the city offered in evidence orders passed by the mayor and alder men, for the purpose of removing a nuisance mainly caused by the discharge of an ancient sewer, and after notice to the tenant and all persons interested, and hearing him in his own behalf, directing that the sewer "be extended five hundred feet over the land and flats belonging to the city in the direction of the channel, under the direction of the superintendent of sewers and drains," and that due notice be given to the tenant an all others interested to remove a building in the highway near the entrance of the sewer into the dock, and that in default thereof the city marshal remove the same; and evidence that immediately afterwards, pursuant to these orders, the building was removed by the city marshal, and a structure six feet wide and ten feet high above the mud, consisting of two rows of piles with a box drain between them, was built under direction of the superintendent of sewers through the whole length of the parcel of flats in question. *Held,* that this evidence was competent to show an act of the city under a claim of title in the whole parcel, which gave it a sufficient seisin to support the action against any one who did not show a better title in himself, and to put the tenant to proof of his title; and that, upon the question whether this act of the city was under a claim of title in the whole dock, the declaration filed by the tenant in an action presently afterwards brought by him against the city for an injury to his wharves on either side of the dock by the discharge of filth through the sewer so built, in which he alleged the title in the dock to be in the city, was competent evidence against him; but that his previous oral admission of the city's title in the dock, and the boundary of his own land by the side of the street and the dock at the end thereof in earlier deeds under which he derived his title, were not competent evidence against him.

GRAY, J. This is a writ of entry to recover a strip of land thirty feet wide, extending eastwardly from the foot of Summer Street in Boston at high water mark, as it anciently existed, to low water mark.

The land next above high water mark on either side of the street was described in the original Book of Possessions of the town of Boston as in Richard Gridley and Nicholas Baxter respectively; and as each bounded, towards the other, "with the street," and, on the east, "the bay." It has already been decided in this case, upon much consideration, that the boundary "with the street" carried the fee to the centre of the street, even if the possessions of Gridley and Baxter were granted by the town or other public authority after the highway was laid out. 13 Allen, 146.

At the second trial, the demandants contended that the flats in front of those lots and of the street did not pass to Gridley and Baxter by virtue of the ordinance of 1647, declaring the title of land next the sea to extend over the flats, because they had been conveyed by the general court of the colony to the town of Boston before the passing of that ordinance ; and that if the title in those flats did pass to Gridley and Baxter, the demandants had since gained a title to the whole, or at least to a part, of the demanded premises by disseisin.

Before proceeding to consider these positions of the demandants, or the rulings made upon them, it may be remarked that, for the reasons fully stated in the former opinion, the grants to Gridley and Baxter appear, by an inspection of the Book of Possessions, to have been made not earlier than 1639 nor later than 1645 ; 13 Allen, 151, 152 ; and at that time all the lands above high water mark in this part of Boston, except so far as they had been granted by the colony or the town to others, may be assumed to have been held, under grant from the general court of the colony, by the town of Boston, for public uses or division among its inhabitants, with the right to make grants thereof, but subject to the paramount authority of the general court at its discretion to grant any part of them, not previously granted to individuals. 13 Allen, 147–150, and authorities cited.

1. The ruling that if, before the passage of the ordinance of 1647, the town had no title in the flats in front of the possessions of Gridley and Baxter and of Summer Street, those flats would pass to Gridley and Baxter by the ordinance, is now admitted to have been correct ; and its foundation is important to be stated, only because it bears upon some of the arguments adduced upon other parts of the case.

By the sixteenth article of the Body of Liberties of 1641, it was provided that all inhabitants that were householders should have free fishing and fowling in any bays, coves or rivers, so far as the sea ebbed and flowed, in the town where they dwelt, unless otherwise appropriated by the freemen of the town or by the general court ; provided that this should " not be extended to give leave to any man to come upon others' propriety without their

leave." " The which clearly to determine," by the ordinance of 1647 "it is declared that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further; provided that such proprietor shall not by this liberty have power to stop or hinder the passage of boat- or other vessels in or through any sea, creeks or coves to other men's houses or lands." 28 Mass. Hist. Soc. Coll. 215, 219. Mass. Col. Laws (ed. 1660) 50; (ed. 1672) 90, 91 ; Anc. Chart. 148, 149. *Commonwealth* v. *Alger*, 7 Cush. 53, 67, 68. The reason why this ordinance does not appear upon the general records of the colony doubtless is, that it was added by one of the committees appointed to prepare the revised body of laws, which was begun upon in 1643, and completed, written out in a separate book and ready for the press in 1647, although it was not printed until the following year, and no copy of it has come down to us. 2 Mass. Col. Rec. 39, 61, 109, 128, 157, 168, 196, 209, 217, 227, 230, 239, 246. 3 Ib. 4, 6, 26, 46, 84, 125. The effect of the ordinance of 1647, as established by a long course of decisions, is, that the title which the proprietor of land bounded by tide water had above high water mark was thereby extended over the shore or flats, subject only to the public rights of navigation and fishing. *Drake* v. *Curtis*, 1 Cush. 395, 412, 413. *Commonwealth* v. *Alger*, 7 Cush. 71–79, 93. And the ordinance applied to all the flats in the colony which had not been granted away by the government before its passage. *Adams* v. *Frothingham*, 3 Mass. 352, 361. *Commonwealth* v. *Alger*, 7 Cush. 93. *Porter* v. *Sullivan*, 7 Gray, 441, 445. *Tappan* v. *Burnham*, 8 Allen, 65.

2. The next ruling to be considered is, " that if the town had title to the flats at the time of the conveyance to Gridley and Baxter, they would pass by the conveyance, though prior to the ordinance of 1647."

If the grants to Gridley and Baxter had been made after the ordinance of 1647, there could be no doubt of the correctness of such a ruling; for it is well settled that any grant, made since that ordinance, will pass the flats as far as the grantor owns, if not

restricted by specific description, but bounded generally by the tide water, by whatever name ; whether " by the sea " or " salt water ; " *Storer* v. *Freeman*, 6 Mass. 435, 439 ; *Green* v. *Chelsea*, 24 Pick. 71 ; *Jackson* v. *Boston & Worcester Railroad Co.* 1 Cush. 575, 578 ; *Saltonstall* v. *Long Wharf*, 7 Cush. 195, 200 ; *Doane* v. *Willcutt*, 5 Gray, 328, 335 ; " by the harbor ; " *Mayhew* v. *Norton*, 17 Pick. 357 ; or " bay ; " *Partridge* v. *Luce*, 36 Maine, 16 ; or " creek ; " *Harlow* v. *Fisk*, 12 Cush. 302 ; or " river ; " *Trull* v. *Wheeler*, 19 Pick. 240 ; *Moore* v. *Griffin*, 22 Maine, 350 ; or " stream ; " *Lapish* v. *Bangor Bank*, 8 Greenl. 85 ; *Thomas* v. *Hatch*, 3 Sumner, 170. The same rule was declared by the general court of the colony in 1669 to apply to a grant by a town of its lands " to a river " within the ebb and flow of the tide. 4 Mass. Col. Rec. part ii. 427, 428 ; cited in 13 Allen, 157. That decision is an adjudication of the highest authority ; for the general court of the colony exercised supreme judicial, as well as legislative power. The Body of Liberties of 1641 concluded with a provision that " whensoever there shall arise any question in any court among the assistants and associates thereof about the explanation of these rights and liberties, the general court only shall have power to interpret them." 28 Mass. Hist. Soc. Coll. 237.

It is also well settled that the rule, that a grant " by a river " above the ebb and flow of the tide passes the soil to the thread of the stream, applies as well to a grant from the state as to a grant from one private person to another. *Lunt* v. *Holland*, 14 Mass. 149. *Claremont* v. *Carlton*, 2 N. H. 369. *Ex parte Jennings*, 6 Cowen, 518. *Coovert* v. *O'Conner*, 8 Watts, 470. *Middleton* v. *Pritchard*, 3 Scam. 510. *Hayes* v. *Bowman*, 1 Rand. 417, 420. *Lord* v. *Commissioners for Sydney*, 12 Moore P. C. 473. And, as already observed, it has been adjudged in this very case that the possessions of Gridley and Baxter, though held by grant from the town or other public authority, yet, by force of the boundary " with the street," extended to the centre thereof.

It is true that by the common law a grant from the sovereign of land bounded on tide water did not pass the shore below high

water mark without express words to that effect. Hale de **Jure** Maris, 17, 18. 3 Kent Com. (6th ed.) 432. *United States* v. *Pacheco*, 2 Wallace, 587. If, as has been generally supposed, such was the law of Massachusetts before the ordinance of 1647, it was because the shore under tide water was held by the colonial government, not merely like other lands within its jurisdiction, but as a portion of the public domain, in a fiduciary relation, and for the public use. *Storer* v. *Freeman*, 6 Mass. 438. *Commonwealth* v. *Alger*, 7 Cush. 65, 66. *Commonwealth* v. *Roxbury*, 9 Gray, 491–494. 13 Allen, 156. But under either law a city or town might own the shore or flats by express grant from the government. *Case of the City of London*, Co. Entr. 536 ; Dav. 56 *b ;* 1 Sid. 148. Hale de Portibus Maris, 57, 58. Com. Dig. Navigation, B. *Coolidge* v. *Williams*, 4 Mass. 140, 144.

It is argued for the demandants, that the " resolution " of the general court in October 1649, (printed in 2 Mass. Col. Rec. 284, 3 Ib. 181, and 9 Gray, 465 note,) shows that before the ordinance of 1647 some towns owned the flats in front of their territory ; that grants of upland made by the town of Boston to individuals before the ordinance carried only to high water ; and that whether that ordinance annexed the town's flats as well as the colony's to the upland, or not, it did not annex to the upland flats which had been previously reserved by the town for the use of the public or of the inhabitants of the town, but that the fee, and not a mere easement, in such flats remained in the town. But that resolution was not a general ordinance, and was not embodied as such in the subsequent revisions of the laws of the colony. To imply from it a grant to every town previously established of all the flats within its bounds would be to deprive the ordinance of 1647 of all effect wherever it was most needed. It was in the nature of a judicial order, made in answer to a " quæry " proposed by a particular town (not named in the record, and which cannot be assumed to be Boston) which at its first settlement had " generally," that is to say, in general town meeting, set apart a parcel of land " lying between the salt marsh and low water mark," " to be improved for thatching houses, the want whereof is very prejudicial to the town ; " and the resolution of the gen-

eral court, determining that such vote of the town was not "dis-
annulled" by the subsequent passage of the ordinance of 1647,
was limited to that case. If it affected the fee in the soil in flats
so set apart, it has no tendency to show that the title in any flats,
not included in the vote of the town, and on which no thatch
grew, was exempt from the operation of the general laws of the
colony. *Lufkin* v. *Haskell*, 3 Pick. 356. There is no evidence
that the flats in front of the street on which the possessions of
Gridley and Baxter were bounded were improved for or appro-
priated to any like public use before or since the ordinance of
1647. A grant of them for a landing place cannot be presumed
without clear proof of such use as would show a dedication for
that purpose. *Green* v. *Chelsea*, 24 Pick. 71. *Bethum* v. *Tur-
ner*, 1 Greenl. 111. And even the use of them for a public land-
ing place, as in the case of a highway, would at most show a mere
easement in the public, quite consistent with a private title in fee
in the soil. *Coolidge* v. *Learned*, 8 Pick. 504, 511. *Green* v.
*Chelsea*, 24 Pick. 71, 80. *Cortelyou* v. *Van Brundt*, 2 Johns.
357, 363. The present action is not a suit for the disturbance of
an easement, but a writ of entry to assert a title in fee.

Applying the rules already stated to this case, the result is,
that if the town of Boston, at the time of making the grants to
Gridley and Baxter, held these flats not for the general public
use, but as its own property, those grants, bounded "with the
bay," passed them to the grantees. If, as is more probable, it
held them, as representing the government, for the use of the
public, it held them subordinate to the paramount power of the
general court to make grants of them. In the first alternative,
they passed as part of those possessions by the grant from the
town. In the second, they were made part of them by the ordi-
nance of 1647, unless granted by the colony to the town after the
grants to Gridley and Baxter and before the passage of the ordi-
nance. The demandants were not therefore prejudiced by the
ruling now in question, unless the flats had been granted to the
town after the grants to Gridley and Baxter and before the pas-
sage of the ordinance. We are then brought to a consideration
of the third ruling.

3. That ruling was, that "there was not sufficient evidence to authorize the jury to find that there was a grant of the flats made to the town between the time of the conveyance to Gridley and Baxter and the passage of the ordinance of 1647."

The evidence mainly relied on for this purpose consisted of numerous records which, the learned counsel for the demandants insist, collectively tend to prove that by virtue of some act of the general court during that time, now lost, the town of Boston was the owner of the flats as well as the upland within its limits. But, upon a scrutiny of the evidence introduced and offered, we are of opinion that it does not justify the inference sought to be drawn from it.

By the law of England, a township on the sea or on a tidal river extends only to high water mark, unless it is proved by grant, prescription or usage to include the shore. Hale de Jure Maris, 27. *The Queen* v. *Musson*, 8 El. & Bl. 900. *Bridgwater Trustees* v. *Bootle*, Law Rep. 2 Q. B. 4; *S. C.* 7 Best & Smith, 348. And in *Commonwealth* v. *Roxbury*, 9 Gray, 451, this court, after a thorough examination of the early laws and records of the colony, was of opinion that the order of the general court in 1636, declaring "that all the rest of the ground lying between Dorchester bounds and Boston bounds shall belong to the town of Roxbury, easterly of Charles River, (except the propriety of the aforesaid town which they purchased of particular persons,)" and thus giving the means of determining the extent of the grant on three other sides, but not expressly including the shore or flats under tide water, passed no title in the soil below high water mark.

The position now taken by the demandants is inconsistent with numerous cases relating to estates in Boston, many of them quite near the premises demanded in this action, in which it has been assumed by the court that the flats lying in front of lands owned in fee by individuals belonged to them by virtue of the ordinance of 1647. *Doane* v. *Broad Street Association*, 6 Mass. 332. *Valentine* v. *Piper*, 22 Pick. 85. *Piper* v. *Richardson*, 9 Met. 155. *Drake* v. *Curtis*, 1 Cush. 395, and 9 Cush. 445 note. *Curtis* v. *Francis*, 9 Cush. 427. *Gray* v. *Deluce*, 5 Cush. 9. *Commonwealth* v. *Alger*, 7 Cush. 53.

In Charlestown, which was settled as early as Boston, in an action of trespass brought against the selectmen for cutting down piers erected by the plaintiffs between high and low water mark, this court, in a case briefly reported in the first volume of the reports, unanimously gave judgment for the plaintiffs, upon two points, which were said to have been repeatedly so decided, namely, 1st. That the title of the flats was in the proprietor of the adjoining land, and he could not be controlled in the improvement of them, by the town or its officers ; 2d. That he might, whenever he pleased, inclose, build and obstruct to low water mark, and exclude all mankind. · *Austin* v. *Carter*, 1 Mass. 231. The second point is stated too generally, and has since been qualified.; but on the first point the decision has never been doubted. 2 Dane Ab. 700. *Commonwealth* v. *Charlestown*, 1 Pick. 180. *Commonwealth* v. *Alger*, 7 Cush. 74, 75. *Commonwealth* v. *Roxbury*, 9 Gray, 494.

We know of but one instance of a separate grant of flats by the colony before the passage of the ordinance of 1647, and that was in the very peculiar case of Noddle's Island, now East Boston. In 1630, Samuel Maverick had already occupied that island, and had built a small fort on it with four cannon, and entertained Governor Winthrop there upon his arrival with the original charter. 1 Hutchinson's Hist. Mass. (2d ed.) 21. 1 Winthrop's Hist. New England, 27. On July 5, 1631, the court of assistants ordered that Noddle's Island and all other islands within the limits of the patent should be " appropriated to public benefits and uses, and to remain in the power of the governor and assistants for the time being, to be let and disposed of by them to help towards public charges." 1 Mass. Col. Rec. 89. On October 2, 1632, Maverick was admitted a freeman of the colony. Ib. 367. On April 1, 1633, Noddle's Island was granted to him, " to enjoy to him and his heirs forever," at a small rent. Ib. 104. On March 9, 1636-7, " Noddle's Island is laid to Boston." Ib. 189. And on May 13, 1640, " it is declared that the flats round about Noddle's Island do belong to Noddle's Island to the ordinary low water mark." Ib. 291. The fact that, after grants of the property in the island to a private person in fee, and of the jurisdic-

tion thereof to the town of Boston, an express order was made as to the flats around it, strongly implies that the title in those flats would otherwise have remained in the colony. *Commonwealth* v. *Roxbury*, 9 Gray, 495.

The earliest act of the town of Boston, offered in evidence by the demandants, is the grant of July 5, 1643, to Henry Simons and others in fee of " all that cove (already bounded) on the north-west side of the causey leading from Charlestown, with all the salt marsh bordering thereupon round about, not formerly granted to any other," which was held by this court in *Rust* v. *Boston Mill Corporation*, 6 Pick. 158, to have passed the title in the flats in the whole of that cove. But the presumption there made in favor of the ancient title of the town to those flats was based upon a consideration of all the circumstances proved in that case, taken together, the principal of which were, that the cove was granted in express terms; that Governor Winthrop and other distinguished citizens were present at the meeting when the grant was made, and could not be presumed to have been ignorant of the legal rights of the town, or to have consented to the grant without being satisfied as to the title; nor could it be presumed that the grantees would, without a thorough examination of the title of the grantors, have made the purchase, thereby engaging to incur the heavy expense of erecting mills, according to the terms and conditions of the grant, as proved by the fuller extract from the town record, there given in evidence; and that, soon after the grant, several proprietors of upland bordering on the same flats, including one under whom the demandant in that case claimed, applied to the town for leave to wharf out before their lands. It is also to be observed that the court in that case assumed that the ordinance declaring flats to belong to proprietors of upland had been passed in 1641, before that grant, instead of in 1647, as it is now known to have been.

In the absence of other proof, the mere fact of a grant from the town of liberty to the proprietors of the land adjoining to extend a wharf over the flats can hardly be deemed evidence that the town owned the title in them. The title in the soil, and the right to wharf over and inclose flats, or the power to regulate such wharfing, are not necessarily interdependent.

Boston *v.* Richardson.

In many parts of the United States, where there is no legislation upon the subject, the proprietor of land by the sea, or by the great lakes and rivers above the ebb and flow of the tide, is held to have, as incident to such proprietorship, the right to build out wharves for his own use and the use of the public, provided he does not obstruct navigation ; and this without regard to the question whether he has or has not the title in the soil under the water before he so builds upon it. Angell on Tide Waters (2d ed.) 235 *& seq. Simons* v. *French,* 25 Conn. 346. *Clement* v. *Burns,* 43 N. H. 609, 617 *& seq. Dutton* v. *Strong,* 1 Black, 23, 31, 32. *Gates* v. *Milwaukee,* 10 Wallace, 497, 504.

There is some evidence that a similar right was assumed to exist in Massachusetts before the ordinance of 1647 ; for in 1641, (which is earlier than any act of the town, or grant of title to flats in Boston, which has been offered in evidence,) at a " quarter court " held by the Massachusetts Company according to the charter at Boston on the 7th of September, " the rates of wharfage and lighterage are referred to the general court, to be brought in by the town of Boston ; " and at the next general court, held on the 7th of October, upon a petition of three inhabitants of Boston, representing that they had been at great expense " in erecting warehouses and framing of wharves with many other necessaries for expediting and safe landing of such commodities and goods as come, not only from about home, but also from further parts, expedient and useful, according to our hopes and intentions, for the public good," and praying the court " to appoint u ito us a certain rate for wharfage, porterage and housing of goods," the general court appointed a committee " to settle the rates of wharfage, porterage, and warehouse hire, and certify the next general cour. and the order to stand the mean while." 1 Mass. Col. Rec. 335, 341. 9 Gray, 514. It does not appear what was done at the next general court, the records of the session being defective. Introd. to 1 Mass. Col. Rec. vi. But on November 4, 1646, the general court established regulations of the rates of wharfage, entitled " orders to be observed by all such as shall bring any goods unto the wharf ; " and provided that " the owners of wharves, whether at Boston or Charlestown, are

required to attend to these rules for wharfage of such goods." 2 Mass. Col. Rec. 170; 3 Ib. 82.

At that time, the question of the right to erect wharves between high and low water does not seem to have been settled in England; for in the king's bench in 1646, "in an action of trespass for carrying away soil and timber, &c., upon trial at the bar, the question arose upon a key that was erected in Yarmouth, and destroyed by the bailiffs and burgesses of the town. And Rolle " (then presiding justice) " said, that if it were erected between the high water mark and low water mark, then it belonged to him that had the land adjoining. But Hale " (of counsel in the case) " did earnestly affirm the contrary, viz. that it belonged to the king of common right. But it was clearly agreed that if it were erected beneath the low water mark, then it belonged to the king." *Johnson* v. *Barret*, Aleyn, 10. The plaintiff afterwards had judgment. *S. C.* 2 Rol. Ab. 250, pl. 7.

Even a title in flats by grant from the colony or Commonwealth is subject, so long as they have not been built upon, to the authority of the legislature, for the protection of the harbors and of the public right of navigation, to prohibit the taking of sand and gravel from the shore, or the erection of wharves beyond certain lines. *Commonwealth* v. *Tewksbury*, 11 Met. 55. *Commonwealth* v. *Alger*, 7 Cush. 53. *Boston* v. *Lecraw*, 17 How. 426, 433. The common right of navigation was expressly reserved in the ordinance of 1647. Ten years earlier, "it was ordered that no ballast should be taken from any town's shore without leave from the townsmen, under the penalty of sixpence for every shovelful taken away, unless such stones as they have laid there before." 1 Mass. Col. Rec. 185. And this order was reënacted in each revision of the laws of the colony. Mass. Col. Laws (ed. 1660) 5; (ed. 1672) 9.

Since the general policy of granting the title in the flats to private proprietors, subject to the public right of navigation, has been manifested by the ordinance of 1647, a grant from the legislature of the right to erect a wharf over flats belonging to the Commonwealth may indeed carry with it a title in the flats; because, the Commonwealth's title in the flats and power to author-

ize the inclosing of them being undoubted, the exercise of the power by the legislature warrants the inference that it intended to convey the title ; and an intention to appropriate such flats to a different public use without compensation will not be presumed from a subsequent grant of the right to lay out a railroad over them. *Fitchburg Railroad Co.* v. *Boston & Maine Railroad,* 3 Cush. 58, 87. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 553. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 457. To infer from the grant by a town of liberty to wharf, which might be in the nature of a mere police regulation, a title in fee in the town, is a wholly different proposition. Because such a grant from the legislature, having both the power to make it and the fee in the soil, passes a title in the flats, it does not follow that a like grant from a subordinate authority, which is not shown to have the title in the flats, amounts to anything more than a mere permission.

In the early days of the colony, under the authority given by the ordinance of March 3, 1635–6, in relation to " the ordering of their own affairs and disposing of businesses in their own town ; " and by the Body of Liberties of 1641, art. 66, giving to " the freemen of every township power to make such by-laws and constitutions as may concern the welfare of their town, provided they be not of a criminal, but only of a prudential nature," and " not repugnant to the public laws and orders of the country ; " and to enforce the same by fine not exceeding twenty shillings, and by distress ; towns exercised much more extensive powers than they lawfully could at the present day. 1 Mass. Col. Rec. 172. 28 Mass. Hist. Soc. Coll. 227. Anc. Chart. 195. *Willard* v. *Newburyport,* 12 Pick. 227, 230. They were expressly authorized by another order of March 3, 1635–6, to demolish houses built " in any town liberties, prejudicial to the towns, without leave from the towns," and to " remove the persons ; " by an order of October 28, 1636, to fix the rate of wages of all workmen, laborers and servants within the town ; and by an order of December 13, 1636, " to order and dispose of all single persons and inmates within their town to service or otherwise," with liberty of appeal to the governor and council or the gen-

eral court. 1 Mass. Col. Rec. 168, 183, 186. At that time, the towns controlled the action of the inhabitants and the enjoyment of private property to such an extent that in the general court in 1637 " it was questioned whether towns have liberty to restrain particular men from sale of their lands or houses; ' and it does not appear what the opinion of the general court was upon the subject. Ib. 201.

The town records, offered in evidence by the demandants, of grants in 1643–47, and 1650–52, to each of several persons, of " liberty to wharf before his propriety," and in two or three instances " before the highway," mostly related to the shore of the extreme north end of the town, and none to the neighborhood of the demanded premises.

The three or four town orders, passed during the same period and relating to the same vicinity as those, concerning common landing places and highways below high water mark,* were rather in the nature of acts of government than of assertions of title in

---

* November 27, 1643. " Thomas Clarke, late of Dorchester, hath liberty to wharf before his propriety in the mill-field against the sea. The like liberty is granted to John Milam, before his present dwelling-house. The like liberty of wharfing is granted unto Valentine Hill before his propriety in the mill-field, provided that a liberty of common landing be reserved between the wharves of Valentine Hill and John Milam aforesaid. It is ordered that the highway of two rods in breadth shall be preserved on the beach (as it is begun) from Edward Bendall's cove to John Gallop's point."

March 30, 1646. " George Halsell is granted liberty to set down a causey ten feet square, from his wharf at the north end of it to low water mark and that passengers shall come and go free to it."

April 26, 1647. " It is ordered that John Anderson hath liberty to wharf afore his propriety and that part of the common highway that lies next to him, he shall make no house on it for any occasion, and he hath liberty to take wharfage on it for the goods that are landed on it."

April 26, 1652. " There is granted to John Anderson liberty to wharf before the highway which adjoineth to his land on the one side and the land of John Crabtree on the other side, and hath liberty granted unto him for to take wharfage of strangers for goods or wood shall be landed by them on said wharf; but he hath no liberty to take wharfage of any inhabitant of the town for either goods or wood landed on that part of the wharf before the highway, provided it lie not there above twenty-four hours, if it be seasonable weather for to get it away, or be not the Lord's day."

the soil; for not only would such easements, as has already been remarked, be wholly independent of the title in fee, but the ownership of the soil would not have enabled the town to establish a highway or landing place below high water mark without authority from the legislature. *Commonwealth* v. *Charlestown*, 1 Pick. 180, 184. *Kean* v. *Stetson*, 5 Pick. 492. *Richardson* v. *Boston*, 19 How. 263, 269, and 24 How. 188.

None of these orders, therefore, as to wharves, landing places or highways, had any tendency to prove that the town had a title in fee in the premises demanded in this action.

The town record of March 23, 1646, stating the propositions for the erection and maintenance of a fortification at Walter Merry's Point at the north end of Boston, shows that the whole proceeding was by agreement between the town and all the inhabitants of that part of it, and its terms strongly imply, to say the least, that the title in the upland there was still in the town.[*] And that fort, like all the other works in Boston and Charlestown for the public defence, though built under the direction of the town, appears to have been considered as belonging to the colony. 3 Mass. Col. Rec. 38. 4 Ib. part i, 183; part ii, 154, 298, 510. 5 Ib. 419.

The proceedings begun in 1673, when a Dutch invasion was apprehended, for building a sea wall or barricado across the principal cove, from Fort Hill to Battery Wharf, and granting the adjoining flats to those who should contribute to its erection,

---

[*] March 23, 1646. "At a general town meeting. Propositions presented to the townsmen on the behalf of the inhabitants of the north end of the town of Boston, the ratification whereof is desired and the registration of them in the town records: 1. That we of this end of the town, whose hearts the Lord hath made willing to set about the erecting and maintenance of a fortification at Walter Merry's Point, may for the future be freed from all rates and assessments to what other fortifications be in the town, until such time as the other part of the town not joining with us herein shall have disbursed and laid out in equal proportion of their estates with ours, as by true account may appear. 2. That the land gained at the town's charge, and staked out to the town's service, by those deputed for that end, to the raising of a work upon, may not by any to their private occasions be employed or made use of, as also that the ground nor flats before the said work may not be disposed of by the town unto any particular man's employ to the prejudice of 'he said work."

appear, by the town records offered in evidence, to have been by agreement between the town and the owners of many, if not all, of the wharves and flats there; and were had at the suggestion of the council of the colony, and approved and ratified by the general court. 5 Mass. Col. Rec. 310. Their validity would seem to depend either upon the agreement and assent of all parties interested, or upon the acts of the government for the public safety and defence. Shaw, C. J., in *Commonwealth* v. *Alger*, 7 Cush. 73. *Brimmer* v. *Long Wharf*, 5 Pick. 131. *Wheeler* v. *Stone*, 1 Cush. 313.

The indenture between the selectmen of Boston and John Woodmancey, dated October 20, 1669, and acknowledged August 21, 1684, is but a deed of confirmation from the town, for a nominal consideration, of a previous grant of lands and flats near the middle of the same cove; and no evidence was offered of the terms of that grant, or of the title which was conveyed by it.

The proceedings in 1709–13 for filling up the flats and building wharves at the foot of Fleet Street, where Clark's Wharf now is, and King (now State) Street, where Long Wharf now is, appear to have been by special agreements between the town and individual proprietors; and it does not appear who had the fee in the soil of those streets.

None of the grants or agreements thus far considered related to lands or flats at or near the spot now in question; and it is stated in the report that there was no offer at the trial to prove anything as to the title in the adjoining uplands. In this state of the case, those grants and agreements, taken singly or collectively, depending upon their own peculiar circumstances, and relating to different places, have no tendency to prove that the town had the title in the flats in front of the land owned in fee by Gridley and Baxter at the foot of Summer Street.

We now come to the examination of the proceedings of the town relating to the very flats in question and those immediately adjacent.*

* March 31, 1673. "Liberty is granted to Richard Gridley to wharf before his own land in proportion with other men."

March 2, 1673–4. "Whereas upon the 31st of March 1673 liberty was granted to Richard Gridley to wharf before his own land in proportion with

For the reasons already stated, the grant from the town to Gridley on March 31, 1673, of "liberty to wharf before his own

other men; and he hath lately for ends staked out a proportion upon the flats not only before his own land, but the town's ground and highway adjoining to his land; it is hereby ordered that the said Gridley do not proceed in wharfing there without the consent and approbation of the selectmen first had and obtained, upon the penalty of twenty shillings."

May 2, 1674. "Liberty is granted to Thomas Peck to wharf upon the flats before his own land near Richard Gridley's, forty-five feet in breadth, according to his upland, and is now staked out; also to Robert Carver to wharf sixty feet in breadth, according to his land above the flats, adjoining to Thomas Peck, now also staked out. And whereas upon the 31st of March 1673 liberty was granted to Richard Gridley to wharf before his land, and upon the second of March 1673-74 a prohibition thereof was ordered, for staking it out beyond his bounds, it is now ordered that John Gill of Dorchester (to whom the said Gridley hath sold the privilege of the said flats) shall have liberty to wharf forty feet in breadth before the said Gridley's land, next to Robert Carver's, as it is now staked out, and is twenty-eight feet northward from a great rock lying upon the flats, before the highway."

May 25, 1674. "John Bull hath liberty to wharf before his own land in proportion with his neighbors."

October 31, 1683. "The selectmen all met this day, staked out a highway for the town's use on the southerly side of the land belonging to the late John Gill, deceased, being thirty feet in breadth from the lower corner of said Gill's wharf next the sea. Also the same day staked out another highway for the town's use on the easterly side of the proprietors' land, which lieth between the above said highway and the way that leads from Deacon Henry Allen's to the windmill, which way is in breadth from the proprietors' lands fifty feet toward the sea shore. The flats and land between this said highway into the sea is granted to the proprietors of the lands which are abutters on the said way in an equal proportion to their several fronts on said way; always provided the said proprietors and abutters maintain in good repairs the said way at their proper cost and charge. It is also ordered that the owners or proprietors of the lands (above mentioned) lately belonging to John Gill, deceased, do remove the fence which now stands in the highway, and that it be done within six months on the penalty of twenty shillings per week for every week's default."

May 21, 1736. According to a report of the selectmen, pursuant to a vote of the town "on a petition of the inhabitants abutters on Sea Street," that street was reduced to thirty-five feet in width, by a vote of the town, the substance of which appears in the following:

May 11, 1773. "The committee, appointed to consider the petition of a number of the inhabitants that Sea Street may be thoroughly repaired, report

land in proportion with other men," has no tendency to prove that the town had the title in the flats which he was thus licensed to wharf over. The only evidence of any assertion at or about that time by the town of a title in the flats before the highway is the recital that Gridley had staked out a part of the ends of his wharf " upon the flats not only before his own land, but the town's ground and highway adjoining to his land," in the order of the town of March 2, 1673–4, (almost a year later,) that he " do not proceed in wharfing there without the consent and approbation of the selectmen first had and obtained." The deed from Gridley to John Gill, also offered in evidence by the de-

---

that they have attended that service, and upon searching the record find that on the 31st of October 1683 the town laid out the street within mentioned of fifty feet in width, and at the same time granted all the flats and lands below said highway into the sea unto the proprietors of the land who were abutters on said way, in an equal proportion to their several fronts on said way, always provided that said proprietors and abutters maintain in good repair the said way at their proper cost and charge. The committee also find that on the 21st of May 1736, on the petition of the proprietors and inhabitants of land in said Sea Street, the town then reduced the width of said street from fifty feet, as it was originally laid out, to thirty-five feet, the present width thereof, but upon this condition: that the same street be kept and maintained in good repair, open, free and unincumbered, at the proper cost and charge of the proprietors and abutters on said street, for the use of the town forever. By this reduction of the width of the street, the proprietors of the lands there had a great addition made to the value of their estates, and therefore are under a double obligation (as the committee apprehend) to keep and maintain the same in good repair at their own cost and charge; and upon their default herein all the land and flats below said street of thirty-five feet in width must revert to the town; and as some parts of it are much out of repair, the town will take such steps thereupon as may be judged necessary.

" The foregoing report having been read, and debate had thereon, the question was put, Whether the town will accept of said report? Passed in the affirmative.

" A motion made that the selectmen be directed to apply to proper persons for the repairs of Sea Street, which are now in such a condition as to be liable to a presentment, and that they dispose of so much of the forfeited flats, &c., as shall be sufficient to defray the charge of repairs, &c.; but, the question not being put, it was Voted, that the further consideration of the methods to be taken with the delinquent abutters for the putting said street in good repair be referred to the adjournment."

mandants, which was executed on March 11, 1672–3, before the first order of the town just referred to, and which was acknowledged and seisin delivered under it on December 6, 1673, before the second order, purports to convey a piece of land " butted and bounded westerly with the land of James Flood, extending itself by the said Flood's line forty feet, northerly with the land of Robert Carver, southerly with the highway, and easterly with the sea, ranging from the said James Flood's line to low water mark," and does not limit the extent or direction of the flats included in the conveyance, but leaves that to be determined by the general law. And the further order of the town shortly afterwards, that Gill " shall have liberty to wharf forty feet in breadth before the said Gridley's land," recites the two preceding orders of the town, and that Gridley " hath sold the privilege of the said flats " to Gill. Here we have an express recognition by the town that the title to the flats in front of Gridley's land belonged to him. The second order of the town had not asserted its title in the flats opposite the end of the street with any distinctness, but merely described them as " before the town's ground and highway." And neither that description, (to which neither Gridley nor Gill is shown to have assented,) nor the corresponding limit of the subsequent liberty to Gill to wharf, nor the liberties granted in the same order to Carver and Peck to wharf in front of their lands next adjoining to the southward, and in a subsequent order to John Bull, owning Baxter's title on the other side, " to wharf in proportion with his neighbors," are sufficient to control the presumption that the title in the flats opposite the street passed by the ordinance of 1647 to Gridley and Baxter in consequence of their title in the soil of the street (as established by the previous decision in this case) or to prove that those flats had before the ordinance been set apart to a public use inconsistent with their ownership of the fee thereof, or had been granted to the town since Gridley and Baxter acquired their possessions.

The order of 1683, by which the selectmen " staked out for the town's use " one highway " on the southerly side of the land belonging to the late John Gill, deceased, being thirty feet in breadth, from the lower corner of said Gill's Wharf next the sea,"

(since called Summer Street,) and another highway, leading southward therefrom " on the easterly side of the proprietors' land " and " in breadth from the proprietors' lands fifty feet towards the sea shore," (since Sea, and now Federal Street,) does n)t show that the town had any title in the soil under either of these streets. The words "staked out," as was adjudged when this case was formerly before us, describe only the act of defining the line of the highway, and are as consistent with a mere easement for that purpose as with a title in fee. 13 Allen, 161. And these words have no greater effect as to so much of either highway as was below high water mark; because, as already observed in considering the earlier orders of the town as to other places, the ownership of the fee would not enable the town to lay out a highway within tide water without authority from the legislature, and any laying out of a highway by lawful authority does not imply title in fee in the land over which it is laid.

The provision of this order, that the flats and land between the second highway and the sea are " granted to the proprietors of the lands which are abutters on the said way " in proportion to their fronts thereon, upon condition that they should repair the way, and the repeating of that condition in the order of the town in 1736 reducing the width of Sea Street, could not deprive those proprietors of the title in the flats which they already had under the ordinance of 1647, and which, so far as concerned the flats in front of the land next Summer Street on that side, had been recognized by the town in the order of March 2, 1673–4. And it may be observed that the town at the meeting in 1773 abstained from acting on the opinion of its committee that the abutters, by failing to comply with the condition as to repairing Sea Street, had forfeited their title in the flats below it.

The result upon this branch of the case is, that all the evidence introduced and offered would not have warranted a jury in presuming a grant of the demanded premises to the town after Gridley and Baxter acquired their possessions and before the passage of the ordinance of 1647. The only offer, made or ruled upon at the trial, to prove a grant of the premises to the town, was restricted to that time   The evidence of acts and records a cen-

tury or a century and a half afterwards, although important to be considered in its bearing upon the next point, was clearly insufficient · to support that proposition in the restricted form in which it was made.

4. The fourth ruling at the trial was, that there was not sufficient evidence to authorize the jury to find that the town had since the passage of the ordinance of 1647 gained any title to the demanded premises by disseisin.

The demandants offered evidence tending to show that a fish box, eight or ten feet long by four or five feet wide, with a folding lid or table, upon which fish were sold, stood upon the premises as early as 1808, and thenceforward until 1824 or 1825, when the city of Boston removed it and put an engine-house in the same place, projecting partly over the dock, which remained until 1830. The demandants also offered the records of two orders of the selectmen of the town of Boston; one in 1761, granting to "Mr. Blake, a fisherman," upon his application, "liberty to set up a fish-house at the end of Summer Street, near the Bull Tavern," "provided he pays one dollar per annum to the town as a consideration for said privilege of a fish market; " and the other in 1803, by which "Joseph Stevens is permitted to occupy the fish stall at the bottom of Summer Street, lately allowed to Robinson, who consents thereto," and two of the selectmen "were desired to direct the alterations in the stall which Mr. Stevens proposes to make."

These licenses were excluded, on the ground that no acts were proved to have been done under them. But we are of opinion that, at least when taken in connection with the evidence of the subsequent occupation of the premises for the purpose mentioned in them, they were admissible. Otherwise, as those acts would not be matter of record, and as the testimony of witnesses to facts which happened at so distant a period could hardly be obtained, it would be impossible to supply the proof required. In *Malcolmson* v. *O'Dea*, 10 H. L. Cas. 593, 614–616, Mr. Justice Willes, delivering the unanimous opinion of the judges who heard the argument, which was affirmed by the house of lords and judgment ordered accordingly, said: "The proof of ancient posses-

sion is always attended with difficulty. Time has removed the witnesses who could prove acts of ownership of their own personal knowledge, and resort must necessarily be had to written evidence." " The rule is, that ancient documents, coming out of proper custody and purporting upon the face of them to show exercise of ownership, such as a lease or a license, may be given in evidence without proof of possession or payment of rent under them, as being in themselves acts of ownership and proof of possession. This rule is sometimes stated with the qualification, provided that possession is proved to have followed similar documents, or that there is some proof of actual enjoyment in accordance with the title to which the documents relate. And certainly, in the case of property allowing of continuous enjoyment, without proof of actual exercise of the right, any number of mere pieces of paper or parchment purporting to be leases or licenses ought to be of no avail. It may be a question, whether the absence of proof of enjoyment consistent with such documents goes to the admissibility or only to the weight of the evidence; probably the latter." " We know of no case in which an ancient document, coming from a proper custody, and purporting to be an act of ownership, by way of lease or license over the property, in company with other evidence showing enjoyment consistent with such ownership, has been rejected upon the ground that the enjoyment could not be referred to the particular document in question." See also *Hewlett* v. *Cock*, 7 Wend. 371.

This evidence as to the maintenance of a fish-house and engine-house on part of the demanded premises by or under authority of the town or city of Boston would have warranted a jury in inferring an open and adverse possession of that part by the city, sufficient to constitute a disseisin. If there were no other evidence upon this point, a disseisin so proved might indeed be confined to the part so occupied, because a title by disseisin is limited by the actual occupation, and is not to be extended by construction. *Kennebeck Purchase* v. *Springer*, 4 Mass. 416. *Brimmer* v. *Long Wharf*, 5 Pick. 131. *Poignand* v. *Smith*, 8 Pick. 272. *Wheeler* v. *Stone*, 1 Cush 313, 317, 322. *Watkins* v. *Holman*, 16 Pet. 25, 55.

The evidence that from 1808 to 1830 there was a capsill or stick of timber, resting on a stone wall at the head of the dock below the foot of Summer Street, and that the city on one occasion during that period repaired the same, (though not perhaps of much weight by itself,) was also competent for the consideration of the jury in connection with the other evidence in the case.

But some of the evidence offered by the demandants has a more extensive application. It appears that in July 1849, for the purpose of removing a nuisance mainly caused by the discharge of an ancient sewer upon the flats at the foot of Summer Street, the mayor and aldermen of the city, after notice to the tenant in this action and all persons interested, and hearing him in his own behalf, ordered " that the common sewer at the foot of Summer Street be extended five hundred feet over the land and flats belonging to the city in the direction of the channel, under the direction of the superintendent of sewers and drains," and also that " due notice be given to Thomas Richardson and all others interested, to remove an obstruction in Summer Street, near where the common sewer enters the dock, within ten days, and that in default thereof the city marshal be instructed to remove the same ; " * that immediately afterwards, pursuant to these orders,

---

* July 3, 1849. " Whereas there are two indictments pending against the city of Boston for a public nuisance on the flats at the foot of Summer Street in said city, which nuisance is said to be caused mainly by an ancient sewer, which has its outlet upon the said flats ; and whereas great complaints have been made to this board of said nuisance by divers citizens ; and whereas due notice has been given to Thomas Richardson and all persons interested, to appear and show cause, if any they have, why the said flats should not be filled up, and the said sewer extended to low water mark, and such other means taken in the premises as should effectually prevent the said nuisance for the future, and at the meeting of this board on the 25th ultimo the said Richardson did appear and was heard in his own behalf ; and whereas the said board have personally viewed the premises, and are satisfied that they are in a state of nuisance and are dangerous to the public health, and that the only effectual method of removing the said nuisance and effectually preventing the same in future is by extending the said drain ; therefore Ordered, that the common sewer at the foot of Summer Street be extended five hundred feet over the land or flats belonging to the city, in the direction of the channel, under the direction of the superintendent of sewers and drains."

the city marshal with a body of men removed a building from a place described by one of the aldermen, who witnessed the transaction, as " the foot of Summer Street below Sea Street, towards the head of the dock ; " and that a structure six feet in width and ten feet in height above the mud, consisting of two rows of piles with a box drain between them, was built under the direction of the superintendent of sewers through the whole length of the dock.

This structure, not laid under ground, nor in land over which a highway had been lawfully laid out, but built of a considerable height upon flats below high water mark, amounted to an actual occupation of the flats covered by it. And the act of the city, in entering upon the flats and constructing it, if done, as the evidence tended to prove, under a claim of title in the whole parcel of flats, (though not perhaps sufficient to affect the public right of navigation,) gave the city a sufficient seisin of the whole parcel to support a writ of entry against any one who did not show a better title in himself, and to put the tenant to proof of his title. *Kennebeck Purchase* v. *Springer*, 4 Mass. 416, 418. *Sparhawk* v. *Bullard*, 1 Met. 95, 100, 103. *Drake* v. *Curtis*, 9 Cush. 445–447 note. *Watkins* v. *Holman*, 16 Pet. 25, 54. Jackson on Real Actions, 157, 158.

Upon the question whether this entry of the city was made under a claim of title in the whole dock, the declaration filed by the tenant in the action presently afterwards brought by him against the city in the courts of the United States for an injury to his wharves on either side by discharging filth at the ends thereof through the drain so built, in which he alleged the title in the dock to be in the city, was competent evidence against him. 13 Allen, 162. *Elliott* v. *Hayden*, 104 Mass. 180, 183.

The majority of the court is therefore of opinion that the verdict which was directed for the tenant must be set aside, and a new trial ordered.

July 30, 1849. " Ordered, that due notice be given to Thomas Richardson and all others interested, to remove an obstruction in Summer Street near where the common sewer enters the dock, within ten days, and in default thereof that the city marshal be instructed to remove the same."

The oral admission by the tenant in 1837 of the city's title in the dock, and the boundary of his own land by the side of Summer Street and the dock at the end thereof in one or more of the earlier deeds under which he derived his title, had no tendency to prove a title in the city by disseisin or under its subsequent entry in 1849, and were therefore not competent evidence upon either of those questions.

5. Upon the further question, argued for the demandants, whether this evidence, taken in connection with all the other evidence introduced and offered, would warrant a jury in presuming a grant of the demanded premises to the city at some indefinite previous time, we express no opinion, because it does not clearly appear by the report to have been raised at the trial, and has not been argued for the tenant; and it will be open to either party to introduce any competent evidence on that question upon the

*New trial.*

*P. W. Chandler, G. O. Shattuck & G. Putnam, Jr.,* for the demandants.

*S. Bartlett & J. G. Abbott,* for the tenant.