FOREST RIVER LEAD COMPANY *vs.* CITY OF SALEM
& others.

Essex.   December 12, 1895. — February 3, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Boundary — Colony Ordinance — Ancient Deed — Interpleader
Equity Jurisdiction.*

The boundary line between two towns, A. and B., was a river.   B. was set off from · A. in 1648–9, " the bounds to be the utmost extent of that land which was H.'s farm and sold to " B.   The conveyance to H. was before the Colony Ordinance of 1647, but the date of the conveyance to B. was uncertain.   H.'s land was bounded by high-water mark.   The practice of more than a century and general repute showed that the river was in A., and for a great number of years B. had acquiesced in the taxation by A. of property situated on and near a bridge upon the river.   *Held*, on a bill of interpleader to determine which town had the right to assess taxes on the property in question, that the boundary was high-water mark.

A bill in equity against two towns, to determine in which the plaintiff is liable to be taxed, if not demurred to, will be entertained.

BILL IN EQUITY, in the nature of a bill of interpleader, filed January 9, 1883, against the city of Salem and the town of Marblehead, and the respective collector of taxes of each, to determine which of them has the right to assess taxes on a certain parcel of land, with the buildings thereon, situated · on and near the lower bridge on Forest River at its outlet into Salem Har-

bor, as appears on the following plan, A representing the line as claimed by Marblehead and B the line as claimed by Salem.

The case was referred to a master, who found and reported the following facts.

The decision of the controversy turns upon the location of the boundary line between the parties at the lower bridge on Forest River. There are two bridges on Forest River; the upper and older was built after 1649 and before 1667, and the lower bridge, on and near which the plaintiff's mills are situated, was built about 1735. The undisputed lines run from the cliff by the sea at or near the line formerly dividing Salem and Lynn, now Marblehead and Swampscott, then by sundry lines to a stone bound near Legg's Hill. From that point to the lower bridge and thence to the harbor the boundary is in dispute. The line, as claimed by Salem, runs from the stone bound at Legg's Hill along the bank of the river on the Marblehead side to a painted mark on the rail fence on the same side, which is on the road a few feet above the bridge, and twenty feet above high-water mark, thence across the road to a cedar tree, thence northeasterly in a straight line through the pump in the rear of the plaintiff's mills to Salem Harbor.

The line, as claimed by Marblehead, runs from the same stone bound at Legg's Hill in continuation of the line as it reaches

that bound to Forest River, a distance of about forty feet at high water, and thence by the middle of the river to Salem Harbor. The property in question lies between these lines.

Salem has assessed this property as being in that city for about fifty years. Before 1882, it was taxed but once by Marblehead, viz. in 1832, and that assessment was abated in whole or in part.

After 1875 Marblehead was advised that the true line was as the town now claims it, and it assessed the property in 1882, as did Salem, and hence this suit.

The tide flows in Forest River to the upper bridge. At low tide it has a channel about five or six feet wide at the upper bridge, and thirty to forty feet wide at the lower bridge. At high water its width between the bridges varies from two hundred and fifty to three hundred feet.

In 1649, when Marblehead was set off from Salem and made a town " by itselfe," the river was probably used at high tide by small vessels, for it was ordered by the selectmen of Salem in 1667 that no vessel should be made fast to the bridge under a penalty of twenty shillings.

In May, 1635, it was ordered by the General Court " that there shall be a plantation at Marblehead, and that as the plantation increaseth, the inhabitants of Salem shall pt'e [part] with the ground." " Further it is ordered that the land betwixt the clifte and the Forest River near Marblehead shall for the present be improved by John Humphrey, Esqr. and that as the inhabitants shall stand in need of it, the said John Humphrey shall pt'e with it, the said inhabitants allowing him equall recompence for his lab'r and cost bestowed thereupon ; provided, that if in the meantime the inhabitants of Salem can satisfy the Court that they have true right unto it, that then it shall belong to the inhabitants thereof."

In March, 1637–8, Humphrey was granted land beginning " at the clifte in the way to Marblehead w'ch is the bound betwixt Salem and Lynn, and so along the line between said townes to the rocks, one mile by estimation, to a great red oake marked, from said which marked tree, all over and under theise rocks upon a straight line to the running brooke by Thomas Smyth's house, all w'ch ground we allow him for his owne, and so from Thomas Smyth's to the sea, in case the ground appears to bee

Mr. Humphrey's upon w'ch Thomas Smyth's and Willie Witter's houses stand, with the ground w'ch they have broken up by their houses."

In January, 1648, at a town meeting of Salem, it was ordered that Marblehead with the allowance of the General Court should be a town, and the bounds to be the utmost extent of that land which was Mr. Humphrey's farm, and sold to Marblehead, and so all the neck to the sea; reserving the disposing of the ferry and appointing of the ferryman to Salem.

In May, 1649, the General Court granted the petition of the inhabitants of Marblehead " to be a towne of themselves, Salem having granted them to be a town of themselves, and appointed them the bounds of their towne w'ch the Corte doth grant."

The resolve of Salem refers to Humphrey's farm as sold to Marblehead. The deed to Marblehead therein referred to has not been found. A memorandum on file in the registry of deeds, made in 1655 by William Hathorne on behalf of Lydia Bankes, supposed to be the heir or an heir of John Humphrey, describes the land as " all that ffarme called ye playnes farme lying in Salem & adjoyning to Mr. Peters farme, being 400 acres more or less, with all ye housing, fencing, & appurtinances wtsoe-ever, excepting 50 acres & 2 ponds formerly granted to Mr. Downing as p an Instrument bearing date ye 24th of ye 7 mo. 1645 appeareth." The two ponds are what are called the " Coye ponds."

The Coye ponds are a short distance above Forest River, and the overflow from them forms part of its supply. They were sold by John Humphrey to Emanuel Downing with so much high ground about them, not above fifty acres, " as is needful to keep the duck coye private from the disturbance of plowmen, herdsmen," etc.

The first perambulation was in 1679, thirty years after the incorporation of Marblehead. The description is:

" From a stump of a white oak tree southward of George Darling's about twenty pole; and thence along southerly of the Coye ponds to a red oak, and from the red oak and a warnutt tree something near the same range, from the warnutt tree to the side of a rock where there is a stump of a white oak, and from thence to an old red oak tree by the side of Tho. Pitman's

salt marsh, unto all which bounds we have laid stones, and are the bounds between Mr. Humphreys farme and the fifty acres belonging to the coye ponds, which fifty acres lies in Salem township. Likewise we do affirme the antient bounds of the farme, viz. from the white oak stump southward of George Darling's to the clift or run of water by the sea, and do settle it as the utmost extent of Marblehead township on that side or part."

These lines or bounds were confirmed in 1684 and 1694. In 1697 these bounds were confirmed, but in the description the perambulation began on the Lynn side, and ended at a red oak tree by the side of Thomas Pitman's marsh. The perambulations of 1703, 1706, 1712, 1715, and 1718 were like that of 1697.

In 1747, the description begins at the cliff and runs on the lines now undisputed to a heap of stones on the north side of a road that leads from Forest River to Marblehead against the corner of Norden's farm, so called, and thence on the same course down to the river. This was followed in 1757, 1763, 1766, 1769, 1772, 1788, 1793, and 1799; in 1804 the bound stone at Legg's Hill appears to have been placed in the ground instead of a heap of stones, and the line was said to run thence north seven degrees west to Forest River. The above lines, says the return, were run by Gideon Foster, Esq. The description in Gideon Foster's report stops at the stone bound, and says nothing about Forest River.

In 1810 the description begins " near Forest River at the bottom of Legg's Hill," where was found a stone marked S. for Salem and M. for Marblehead, and runs thence by the undisputed lines to the seaside at Lynn.

This description is repeated in the several perambulations down to and including 1870.

In the perambulation of 1875, signed by both parties, the description, so far as material to this case, is as follows:

" Beginning at a point in the road from Marblehead to Salem, near the Forest River Lead Mills, so called, and on the southern side of Forest River, where we found no stone nor any mark indicating the true bounds, excepting a mark painted on the railing of the bridge over said river, said mark being between the

last round iron support or post to said rail, passing northwardly and the first square iron support or post to said rail passing in the same direction, thence running in a S. W. direction to·a place near Forest River at the bottom of Legg's Hill (so called), where we found a stone marked S. for Salem and M. for Marblehead," etc.

The last perambulation given in evidence was in 1880, and is not signed on the part of Marblehead.

No stone bound has ever been placed at the angle where the mark on the rail is found.

The St. 1826, c. 117, § 1, requires permanent stone monuments to be placed at each and every angle of the line between towns, where the lines are not bounded by the ocean or some permanent stream of water. .

In 1794, a map was filed with the Secretary of the Commonwealth, and with it a description of Salem : " The Town of Salem joins Marblehead, on the south side of the water of Forest River, which communicates with South River, and the line runs from a point on that river below Legg's Mill, so called, to Bartlet Beach on Lynn Bay. . . . Forest River at the lower bridge is three hundred and forty-six links wide upon the bridge, and contracts greatly at the upper, from which its course is N. 285,50. It receives waters from Great Swamp and other smaller swamps, from Coy and Deep Ponds, and from Peckman's Brook."

The plan shows the line as running by the river, but the scale is so small that it cannot be seen whether the middle or the south bank of the stream is intended.

In 1735, John Gardner and Jeremiah Gatchell petitioned the selectmen of Salem to grant them the right to dam the river where the lower bridge now is. This petition was granted on condition that the petitioners should give and maintain a suitable way through their own land, and make and maintain a good cart bridge over the river at their own cost and charge. A bond was given to the town of Salem to meet this obligation of repair, and the duty is mentioned in the deeds of the property down to the present time.

In 1736, the lower bridge was laid out by the Court of Sessions as a part of a highway between Salem and Marblehead, but the boundaries between the towns did not come into consideration.

Salem has always repaired the whole of the bridge, and up to the iron posts; Marblehead has repaired the road down to those posts. In 1681 the towns agreed to repair the bridge and the causeway belonging thereto at their joint expense. This was the upper bridge, as there was then no other.

In 1806, a committee reported to a meeting of the inhabitants of Marblehead that Mr. Dane of Beverly had given an opinion in "wrighting" that Marblehead was not obliged to build or repair any part of the bridge or causeway, or to be at any expense about it, it being wholly in the town of Salem; and the town voted to do nothing further about it. Whether this opinion and vote refer to the upper or the lower bridge is uncertain.

In 1743, Salem was indicted for not keeping the bridge in repair. This is the lower bridge.

There is no evidence when, or by whom, or for what purpose, the mark on the rail, which is called by Salem a monument, was made, or the iron posts were put up. They are not mentioned in any perambulation until 1875. One witness had heard that Salem put up the posts. The commissioners appointed under St. 1881, c. 196, established the line between Salem and Marblehead on tide water below the lower bridge, beginning "at the point at or near the mouth of Forest River where the channel of said river is crossed by the Marblehead Branch Railroad Bridge, thence by certain lines to the sea."

"Upon the evidence, I find that the true line between Salem and Marblehead is Forest River. At the time Marblehead was set off, the river was navigable at the part in controversy. When the dam and lower bridge were built, about 1735, and since, this part of the river has been a tidal mill-pond. If the mark on the rail above mentioned is a monument, there is no evidence how the line runs from that point to the harbor. Three witnesses spoke of perambulators having gone down from the rail to the well on the line claimed by Salem, but when they did this does not appear. I infer from the facts above recited that the general repute in both towns was, that, while Forest River was the boundary, the river itself was in Salem. This view appears to have been acquiesced in for a great number of years by Marblehead, by permitting Salem to tax the now disputed territory and to repair the bridge. I have already said that, if the line claimed

by either party is the true one, the disputed territory belongs to that party. But there may possibly be a different line from either. If the true line is low-water mark on the Marblehead side, most of the locus is in that town. If the line is at high-water mark on the Marblehead side, some part of it is in that town."

In the evidence reported by the master was that of Benjamin Parmiter, who testified in 1681 that the "plain ffarme now in controversy was bought of Maj<sup>r</sup> Hathorne about the year 1645 by Mr. Morse Maverick, David Corwithen & severall other Proprietours."

Hearing before *Holmes,* J., who, at the request of the parties, reported the case for the consideration of the full court, upon the master's report. If the court was of opinion that the boundary is low-water mark, the case was to stand for further hearing as to how much, if any, of the plaintiff's property lies below low-water mark.

*E. Avery & A. E. Avery,* for the town of Marblehead.

*F. L. Evans,* for the city of Salem, submitted the case on a brief.

HOLMES, J. We see no reason for changing the master's findings in any way that affects our conclusion. We start, therefore, with the fact that the boundary in question is Forest River. The question left open is whether the line at the lower bridge is the middle of the stream or high or low water mark. The conveyance to Humphrey in March, 1637–8, having been made before the ordinance of 1648, conveyed only to high-water mark. *Tappan* v. *Boston Water Power Co.* 157 Mass. 24, 26, and cases cited. It follows that, when in 1648 and 1649 Marblehead was made a town, " the bounds to be the utmost extent of that land which was Mr. Humphrey's farm and sold to Marblehead," the line was at high-water mark unless the farm had been enlarged before the Salem vote of 1648. There is no ground for suggesting that the boundary had been extended to the middle of the stream. The only question is whether it had been carried down to low-water mark. Before 1648 the ordinance had been passed which gave the proprietor of the adjoining land " propriety to the low-water mark, where the sea doth not ebb above a hundred rods." The effect of the ordinance was that the title which the

proprietor of land bounded by tide water had above high water was extended over the shore or flats, subject to the public rights reserved, and the ordinance applied to all the flats in the Colony which had not been granted away by the government before its passage. *Boston* v. *Richardson*, 105 Mass. 351, 354, and cases cited. But the latest moment which can be taken as fixing the boundary line according to the strict literal meaning of the words quoted above is the date of the sale to Marblehead. And although perhaps it would be possible to read the words as referring to the title as it stood at the time of the Salem vote of 1648, the practice of the parties to which we shall refer in a moment is in favor of the literal construction. As has been known for a long time, the part of the ordinance which deals with flats was not in the original Body of Liberties of 1641, but was an addition of 1647. Body of Liberties, No. 16, (Whitmore's ed.) 37. Mass. Colony Laws, (ed. 1660) 50, (Whitmore's ed.) 170. 28 Mass. Hist. Soc. Coll. 215. *Boston* v. *Richardson*, 105 Mass. 351, 354. So that the exact question is whether the conveyance to Marblehead was made before 1647. The deed has not been found. A memorandum in the registry of deeds is interpreted by the master as referring to it and as giving its date, but the words are " excepting 50 Acres & 2 ponds formerly granted to Mr. Downing as p an Instrument bearing date ye 24th of ye 7 mo. 1645 appeereth," and seem not to refer to the land or to the conveyance in question, but to a conveyance of the two ponds and so much high ground about the ponds " as is needful to keep the duck coye private from the disturbance of plowmen," etc. If we are right, the only direct evidence of the date is the testimony of Parmiter in 1681 that the plain farm was bought of Major Hathorne about the year 1645 by Mr. Maverick and several other proprietors. Some doubt is thrown on this testimony by the above mentioned memorandum, which is a minute of such a sale dated 1655. But that the original boundary had not been changed is confirmed by indirect evidence. The practice of more than a century and general repute show that the Forest River is in Salem, and for a great number of years Marblehead has acquiesced in the taxation of the disputed territory by Salem. The ancient construction adopted by the parties, and adhered to until recent times, war-

rants an interpretation of the original set-off which most nearly justifies their conduct. See *Chenery* v. *Waltham*, 8 Cush. 327 ; *Indiana* v. *Kentucky*, 136 U. S. 479, 510. We are of opinion that the boundary is high-water mark.

As no objection is taken by either defendant to maintaining a bill of interpleader, both parties seemingly wishing to have the merits decided and having been at some expense for that purpose, we have expressed our opinion as was done in *Hardy* v. *Yarmouth*, 6 Allen, 277. The reasons for holding such a bill demurrable mentioned in *Macy* v. *Nantucket*, 121 Mass. 351, are reasons of policy in favor of the prompt collection of taxes, which may be waived by the parties interested. The case seems to be a proper one for interpleader, except for the considerations to which we have referred. See *Thomson* v. *Ebbets*, Hopkins Ch. 272 ; *Mohawk & Hudson Railroad* v. *Clute*, 4 Paige, 384, 391 ; Cooley, Taxation, (2d ed.) 786.     *Decree accordingly.*