NEWBURYPORT REDEVELOPMENT AUTHORITY *vs.*
COMMONWEALTH & another.

Essex. November 8, 1979. — February 22, 1980.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Way,* Public: establishment, discontinuance. *Proprietors of Common
    Lands. Trust,* What constitutes, Public trust. *Municipal Corpora-
    tions,* Trusts. *Real Property,* Littoral property. *Public Land. Com-
    monwealth,* Real property. *National Environmental Policy Act. Evi-
    dence,* Relevancy. *Judge,* Disqualification. *Practice, Civil,* Costs.

A city's order of discontinuance of certain town ways was governed by
    G. L. c. 82, § 21, which contains no notice requirement; the notice
    requirement applicable to highways was not relevant, and use of the
    ways by nonresidents of the city under a claim of right for over twenty
    years did not transform the town ways into highways. [222-226]
The selectmen of a town lacked jurisdiction to lay out town ways below
    high water of the Merrimack river, unless the town itself owned the
    flats therein, in the absence of legislative authorization. [223-224]
There is no constitutional requirement that a city council give notice of its
    intention to discontinue a town way or hold a hearing before doing so.
    [226-227]
In an action by the Newburyport Redevelopment Authority to confirm its
    title to a parcel of land, there was insufficient evidence to warrant a
    finding that certain ways within the locus were ever laid out as public
    ways, had become public by dedication prior to St. 1846, c. 203, § 1,
    or had become public by prescription. [227-228]
A reference to "ways" in various deeds in evidence at a trial did not tend
    to show that those "ways" were public ways. [228]
Acceptance by a municipality of parcels of land under grants by proprie-
    tors which specified that the lands were to be held in trust to keep open
    and maintain two ways "forever" constituted contracts which the Leg-
    islature could not impair by statute, and an order of the city council on
    March 28, 1977, to "discontinue . . . all public rights . . . in all ways"
    was invalid as to the two ways. [228-231]
Although a grant of land by a town's proprietors created an enforceable
    trust to keep open and maintain a landing on a river, the proprietors
    could not by their grant deprive the Commonwealth of its right to

make such use of adjoining tidelands as it might see fit, including the filling of those tidelands in such a way as to separate the landing from the river. [231]

It was within the competence of the Legislature to authorize, by St. 1873, c. 136, and St. 1889, c. 247, § 1, the revocation of reservations set forth in a town's grants of land which constituted dedications of the subject land for the purpose of landing goods by the public. [231-232]

In an action by the Newburyport Redevelopment Authority to confirm its title to a parcel of land, there was no merit to an intervener's contention that an order of discontinuance of town ways within the locus was invalid because the Legislature had not complied with the two-thirds vote requirement of art. 49 as amended by art. 97 of the Amendments to the Massachusetts Constitution in authorizing the order where the ways had ceased to be used for the "development and utilization of . . . water . . . resources" long before art. 49 was ratified in 1918 [232-233]; nor was the order of discontinuance invalid because the city failed to notify and consult with the Advisory Council on Historic Preservation before adopting the order [233-237]; nor was the city estopped from discontinuing town ways within the area as a result of certain remarks made by the executive director of the authority [237-238].

Transfer of the Commonwealth's title to certain "tidelands" to the Newburyport Redevelopment Authority, pursuant to St. 1967, c. 702, § 2, for inclusion in an urban renewal project was for a public purpose; any subsequent grant of the tidelands by the authority to private individuals, however, must be subject to a condition subsequent that the tidelands be used only for development for public purposes. [238-239]

Lands transferred by the Commonwealth to the Newburyport Redevelopment Authority pursuant to St. 1967, c. 702, were neither "devoted to one public use" nor "diverted to another inconsistent public use" within the meaning of *Robbins* v. *Department of Pub. Works*, 355 Mass. 328, 330 (1969). [239-240]

Title to lands transferred by the Commonwealth to the Newburyport Redevelopment Authority pursuant to St. 1967, c. 702, § 2, vested in the authority in 1969 under the express terms of the statute even though the compensation due the Commonwealth had not been determined or paid; therefore the 1972 approval and ratification of art. 97 of the Amendments to the Massachusetts Constitution was inapplicable. [240-242]

Section 3 of St. 1967, c. 702, represented an exercise of the Commonwealth's police power in authorizing the Department of Public Works to issue to the Newburyport Redevelopment Authority certain irrevocable licenses respecting fill and structures in Newburyport harbor; since § 3 did not transfer any property interest to the authority,

the two-thirds vote requirement of art. 97 of the Amendments to the Massachusetts Constitution was not applicable to amendments to § 3. [242]

Statute 1960, § 94, was valid as authorizing the city of Newburyport to discontinue using certain land as a park and to use it for any municipal purpose the city might determine, and the city's subsequent sale of the land did not violate either G. L. c. 44, § 63, or c. 79, § 5 [243-244]; however, the land remained subject to the enforceable public trust created by proprietors in 1751 that it be used for a way and public landing place in perpetuity [244].

In an action by the Newburyport Redevelopment Authority to confirm its title to a parcel of land, an intervener challenging the authority's title was not prejudiced by the exclusion of certain exhibits and testimony which did not show that any portion of the locus had ever been taken or acquired for the purpose of preserving its historic or archaeological resources.  [244-245]

In an action by the Newburyport Redevelopment Authority to confirm its title to a parcel of land, the correctness of the judge's finding that certain ways within the locus had been abandoned prior to an order of discontinuance was irrelevant where the order of discontinuance was valid.  [245]

The judge in an action brought by the Newburyport Redevelopment Authority to confirm its title to a parcel of land was not required to disqualify himself merely because he had been a legislator at the time of the enactment of St. 1967, c. 702, which transferred title to certain Commonwealth property to the authority.  [245]

In an action by the Newburyport Redevelopment Authority to confirm its title to a parcel of land, an intervener was not entitled to recover its costs by reason of a stipulation between the parties that the intervener should "not be precluded in any forum from seeking legal fees" or by reason of the provisions of G. L. c. 187, § 4.  [246]

PETITION filed in the Land Court on March 29, 1977.

The case was heard by *Randall, J.*

*Howard R. Palmer,* Assistant Attorney General, for the Commonwealth.

*Stuart T. Freeland* (*Hugh J. Doyle* with him) for the plaintiff.

*William R. Harris,* of New York (*Robert S. Wolfe* with him) for the Committee on Civic Rights of the Friends of the Newburyport Waterfront.

GRANT, J.  This is a petition in the Land Court by which the Newburyport Redevelopment Authority (authority)

Newburyport Redevelopment Authority *v.* Commonwealth.

LEGEND

▨▨▨▨ = Ways Preserved by Order of Discontinuance.

— — — — Denotes    Boundary Line

Note    This Sketch not to    Scale.

seeks to confirm its title to approximately 10.4 acres of land (locus) depicted on the accompanying sketch plan.[1] An organization known as the Committee on Civic Rights of the Friends of the Newburyport Waterfront (committee) was permitted to appear, file an answer to the petition and participate in the proceedings. The primary thrust of that answer was an effort to have the court establish and declare that certain portions of the locus (shown as ways 1 through 11 on the sketch plan) "be held in public trust and that the public interest in these sites be registered in the name of the public"; the committee opposed the petition on other grounds as well. Following a seven-day trial, the judge of the Land Court entered a decision which rejected all the committee's contentions and ordered that title be confirmed in the authority, subject to certain rights of the Commonwealth which are not in dispute. The committee appealed. G. L. c. 185, § 15.[2]

The authority's claim to the locus arises from the following chain of events. On June 3, 1965, the authority adopted, and four days later the mayor and city council of Newburyport approved, an urban renewal plan (G. L. c. 121, § 26ZZ, as amended through St. 1960, c. 776, § 7; see now G. L. c. 121B, § 1) for an area encompassing that portion of the locus not covered by the Merrimack River, as well as other land south of the locus. Thereafter, on some undisclosed date prior to July of 1971, the area covered by the plan was enlarged to include the entire locus.

By St. 1967, c. 702, § 1, the Legislature authorized the authority to "include in the area covered by an urban renewal plan . . . under [G. L. c. 121] so much of the tidelands as lie within" the area covered by the amended plan.

---

[1] The petition also sought confirmation of the authority's title to a second parcel of land lying on the southerly side of Merrimac Street. The title to that parcel has been confirmed without opposition.

[2] A substantial portion of the delay in deciding this case is directly attributable to the committee's failure to comply with the requirements of Mass.R.A.P. 16(a)(3) and (e), 365 Mass. 861, 862 (1974). Its brief should have been summarily rejected by the clerk.

By § 2 of that act the Legislature provided that "all right, title and interest of the commonwealth in and to the tidelands" within the area described in § 1 "shall vest in the Authority" upon the occurrence of certain conditions. Those conditions had all occurred by October 26, 1969. Section 2 also provided for a title examination "to determine the right, title and interest of the commonwealth in the area vesting in the Authority under this act" and for payment by the authority to the Commonwealth of "such compensation as . . . may be . . . determined by the governor to be just compensation therefor," based upon an appraisal by a real estate expert and a recommendation of the Department of Public Works. The title examination had apparently not been undertaken by the time of trial. It has been stipulated by the Commonwealth and the authority that the latter's title to the locus is to be confirmed subject to the Commonwealth's receiving the compensation required by § 2.

On November 13, 1967, the city council of Newburyport voted that the city convey to the authority "[t]he premises known as Riverside Park." The authority appears to have purchased several other parcels within the locus prior to 1968. By separate orders of taking adopted on March 14, 1968, and July 20, 1972, the authority took by eminent domain the fee in the entire locus, thereby confirming its title to the parcels within the locus which it had already purchased and gaining title to the remainder. The takings included "the fee to the center of any and all public streets, highways and public ways" but excluded "any and all easements of public highways and public easements of travel in and to any and all streets, highways and public ways" within the locus.

On March 28, 1977, the city council voted without notice or a hearing to "discontinue[ ] any and all public rights in any and all portions of streets, highways, ways or landings" lying within the locus except the southerly portions of ways 5 through 8 and 11 as shown on the sketch plan. On the same day the city council released all the city's "right, title and interest, if any there be, in and to" the locus except the

portions of the ways which had been excluded from the operation of the order of discontinuance.

The authority's title to the locus thus depends upon (1) the effects of the Legislature's act providing for the vesting in the authority of the Commonwealth's title to the tidelands lying within the locus, (2) the city's sale of Riverside Park to the authority, (3) the authority's eminent domain takings, and (4) the city council's order of discontinuance. The committee's first attack on these various actions came in an action it brought in the United States District Court for the District of Massachusetts. On February 1, 1977, that action was dismissed pursuant to a stipulation by which the parties agreed, among other things, that the authority would seek confirmation of its title to the locus in the Land Court and would request that court to "declare and determine the extent of then existing public rights in ways and Riverside Park situate" within the locus. The present petition followed.

1. We now summarize certain historical facts. On May 6, 1635, the General Court passed an order by which "Wessacucon is allowed by the Court to be a plantacon . . . hereafter to be called Neweberry.[3] Further, it is ordered, that it shalbe in the power of the Court to take order that the said plantacon shall receave a sufficient company of people to make a competent towne." 1 Records of the Governor and Company of the Massachusetts Bay 146 (1853). Apparently the original settlers of Newbury never obtained from the Legislature any grant of title to any of the land in Newbury other than that which is to be implied from the language of the foregoing order. As was common during that period (Akagi, The Town Proprietors of the New England Colonies 15-21 [1924]), the early settlers of Newbury soon organized a body of proprietors who held title to and managed the common lands of the town. We find in

---

[3] The town of Newburyport was not incorporated until 1764, when the General Court approved its being set off from the town of Newbury. Newburyport became a city in 1851 by virtue of St. 1851, c. 296.

the records of the Newbury proprietors an order passed by them in 1642 listing ninety-one persons and stating, "It is declared and ordered hereby . . . according to the former intentions of the towne that the persons *only* above mentioned are acknowledged to be freeholders[4] by the town and to have a proportionable right in all *waste lands, commons, and rivers* undisposed of and such as by from, or under them or their heyers have bought, granted, or purchases from them or any of them theyr right and title there unto and *none else*" (emphasis original). Akagi, at 129 & n.31. Coffin, Sketch of the History of Newbury, Newburyport, and West Newbury 292 (1845).

From the 1600's into the 1800's wharves were developed and expanded within the locus. So far as appears from the present record, those wharves extended for the most part only to the approximate location of the natural low water mark. Buildings were constructed on these wharves, particularly on the southerly portion of each. These appear to have been primarily commercial buildings, stores and warehouses. See *Adams* v. *Frothingham*, 3 Mass. 352, 361 (1807). It is, in most cases, the spaces between those buildings which the committee asserts were public ways to the waterfront. The following is a summary of the evidence concerning the origin and development of each of the alleged ways through 1869, when construction of the Newburyport City Railroad was authorized along the waterfront.

(a) Way 1. On July 12, 1751, the proprietors of Newbury voted "that the landing [   ] in . . . Newbury called . . . Somerbys landing Place [   ] [is] now . . . Voted to the towns use & to lay so wide as [it is], now unsold & the same to lay for ways & landing, for ever & no more of said ways to be sold or be use any other ways But as is in this vote expressed." On March 10, 1752, the town meeting of Newbury received the following communication: "[A]s the Proprietors of this Town at their last meeting voted to Grant

---

[4] In Newbury the term "freeholder" meant "proprietor." Akagi, at 130 n.33.

the Landing [   ] at . . . Somerbys so called to Lay for Pub-lick ways & landings for the town's use — We have laid out the same for the uses . . . ." The town meeting accepted the ways and ordered that they be recorded. On July 10, 1781, the town meeting voted to request the selectmen "to Lay down for a Landing or private way for the use of the Town, all the Land and flatts in Somerby 's Landing so called, to the Eastward of a line of the Westerly side thereof, agreable to a plan of the Westerly side of said Landing, presented to and accepted by the Town, which was Taken by order of the Select Men of the 3 Instant." The warrant for the March 14, 1782, town meeting indicates that one of the orders of business was "To accept of the laying out of Somerby Landing, so called, as a private way or landing by the selectmen." What action, if any, was taken at that meeting is not disclosed on the present record.

(b) Way 2. On March 26, 1722, a committee previously appointed for the purpose by the proprietors reported that it had sold land at way 2, apparently stretching from Merrimac Street to the Merrimack River, to Banajah Titcomb and his son Edmund, and the proprietors confirmed this action. There is no indication that any right was reserved to the public in this transaction. A description of property seized from one Jonathan Titcomb in satisfaction of an unpaid debt which was recorded on July 23, 1788, refers to a "way leading from Merimack street to said wharf [Titcomb's Wharf]" but does not indicate the nature of that way.

In 1764, shortly after Newburyport was incorporated, in 1805 and in 1872, when the Newburyport City Railroad was being built along the waterfront, the town appointed committees to report on the conditions of the various land-ings and ways leading to the river. None of the committee reports mentions the existence of any town or public way or landing at the location of alleged way 2.

(c) Ways 3 and 4 (Central Wharf). A "Generall Meeting of the Towne" on January 5, 1679, voted and granted that one Greenleaf and one Davison "should have . . . a place to build a wharf" on a parcel of land stretching from high to

low water mark at the approximate location of way 3, "provided the Inhabitants of the Towne shall have liberty from time to time to land wood and Hay or other goods so that the said goods ly not above four and twenty hours neither at any time to do them damage." On March 1, 1680, "[a]t a legal meeting of the freemen in Town" Benjamin Rolfe, Dr. Dole and Richard Dole "proposed . . . to build a wharfe & a place to build vessels" on a parcel of land stretching from high to low water mark at the approximate location of way 4. This proposition was "voted and granted" upon the condition, among others, that "the Inhabitants of the Towne shall have free liberty to land goods upon it with pay so that they do not damnify the owners."

On May 11, 1771, the selectmen voted to lay out a "Town Way or Landing leading from Merrimack Street to the Channel of Merrimack River" on "all the Land or Flatts" between certain lands at the location of ways 3 and 4 (Central Wharf). On March 2, 1772, the town meeting voted to accept this action.

On September 16, 1833, the town meeting voted to grant "permission . . . to the Proprietors of Central Wharf to improve and streighten the entrance to said Wharf as a public highway at their own expense" and voted that the selectmen be a committee to lay out the way. In 1834 the selectmen reported that they had "laid out and straightened the entrance to Central Wharf as a public highway for the use of the inhabitants of said town." The owners of the wharf declared that they would no longer claim the land over which the way had been laid out; it is apparent that that declaration applied only to the entrance to Central Wharf, not to the wharf itself.

(d) Ways 5 and 6 (Market Landing). Market Landing (originally Middle Ship Yard) was "left by the first settlers . . . and occupied by the inhabitants from 1635 to 1726, by those who chose to use it as a landing place." During this period the town let out the landing, but on April 26, 1726, the proprietors chose a committee to let the landing out, which they did until about 1760, apparently without objec-

tion by the town. On May 11, 1771, the selectmen voted to lay out "a Town Way or Landing leading from Merrimack Street to the channel of Merrimack River," apparently covering all of Market Landing. On March 2, 1772, the town meeting voted to accept that action. On October 20, 1774, the town meeting chose a committee to make a plan of this way and to ascertain its bounds with precision.

In the late 1790's the proprietors and the town entered into extended litigation concerning which had title to the Market Landing and certain other lands in Newburyport outside the locus. The dispute was ultimately resolved when, on October 28, 1826, the proprietors of the common and undivided lands in Newburyport (and Newbury and West Newbury), in return for $1200, conveyed to the town of Newburyport "all the . . . title . . . of said Freeholders and Proprietors in and to all their common and undivided lands situate in said Newburyport . . . subject however to the following exceptions and reservations, That is to say the road of one and one half rod wide laid out on the Easterly side of the Middle Shipyard or Market landing so called from Merrimack Street to the River [way 6] shall be kept open and not incumbered with any building forever." In 1861 the city extended Market Landing 100 rods toward the Merrimack River and widened it.

(e) Way 7. On March 7, 1733, the selectmen of Newbury made the following report: "Whereas divers of the Inhabitants of the Town of Newbury have signified their desire to us the Subscribers to have a way laid out on the westerly side of Cap' John Greenleaf's land . . . which way have been time of mind used for a Way for carting to and from Merrimack River — and we viewed the said Land, and find it very convenient for a way — and have laid out a way of one Rod and an half wide . . . to the Channel." The town meeting accepted this way on March 13, 1733.

(f) Way 8 (Ferry Way). On September 30, 1678, a committee appointed by the town meeting "laid out to . . . [Richard] Dole" certain land "with the flatts adjoyning there too excepting two Rod in Breadth upon the Easterly

poynt of upland which is to ly for a perpetual way for the town use to the Dock for to unload Hay, Wood, Timber, Boards or anything else which is produced in or upon the River, it being not imported from or exported to the sea." The committee and Dole "agreed that the said Dole is to set a wharf against the two Rod it is appoynted for a way for the Towns use as is above expressed."[5]

In 1687 Sir Edmund Andros, then governor of the colony, granted to Capt. John March "[a] new Ferry across the Merrimack . . . from Newbury, to Rings Point, in Salisbury." This ferry, which the town of Newbury purchased from March in 1705, apparently operated throughout its existence from the foot of the way reserved for the town in the grant to Richard Dole. Currier, "Ould Newbury" 157 (1896). Coffin, at 148. On February 23, 1720, the proprietors voted that the "select men are to lay out a way of two Rods broad as reserved in Mr. Dols grant downe to ye Dock." There is no further indication in the record of action by the town with respect to the way until March 10, 1724, when the following agreement was executed: "[W]here as there has been considerable difference about ye place where the way should be layed, to ye Dock called Doles-Dock formerly reserved for ye Towns use, we Richard Kent[6] & Benjamin Woodbridge[7] . . . and the select men of . . . Newbury mutually agree and consent that ye said way shall be layed out in form and manner following viz. the said Kent agrees forthwith, to remove ye frame lately erected . . . fourteen feet right on end westward from said Woodbridges his wharf, and said way is to run on a strait line — from said Kents now house dwelling . . . and on ye same line three rods into said Dock, from ye middle of said frame, toward the River . . . ."

---

[5] The grant to Richard Dole appears to have included all the land from Market Landing (Middle Ship Yard) to the way reserved for the town's use. Thus, way 7 crossed a portion of the land covered by this grant.

[6] Kent was a successer in title to Richard Dole.

[7] Benjamin Woodbridge was a successer in title to Paul White and Thomas Woodbridge.

In 1764, shortly after the incorporation of Newburyport, the town meeting chose a committee "to examine the town ways and landings." This committee reported with respect to the "way down to the ferry which is not properly a highway, nor landing as it appears to us, but an agreement formerly made in the year 1722, [between] Col. Kent and Mr. Woodbridge and the selectmen of the town, we find it as they have recorded it, as to width, but think it of no use to the town as it lies, since by that agreement the town have no right to go further than three rods into the dock which will not carry them to low water mark. But with submission would recommend to the town to order the selectmen to lay it down as wide as it is now, and let it go to the river, by which means it may hereafter be of some service to the town, but as it now is we esteem it to be none." Whether the town meeting took any action on this recommendation does not appear in the record.

On September 12, 1818, the selectmen informed the town meeting that they had "Laid out for the use of the town . . . a town way, running from Water Street to the ferryways." Their description of the way indicated it went to the low water mark. On September 14, 1818, the town meeting voted to approve "the doings of the Selectmen in laying out a highway between Water Street and the ferryways & do accept the same as a public highway." A portion of the easterly side of this way was discontinued on March 16, 1825.

(g) Ways 9 and 10. On April 25, 1655, the town meeting "Granted to Capt. Paul White a parcell of Land not exceeding half an acre . . . for to make a Dock and wharfe and warehouse . . . but the Town granteth no Liberty of freehold or comonage heerby and if he shall heerafter sell it when he hath built uppon it the Towne shall have the foresaking of it." An entry in the town records dated 1656 states in part, "Lay'd out to Capt. Paul White a parsoll of land about half an aker at the newtowne at the end of Fish [now State] Street, joyning to Merrimack River on the norwest . . . ." This grant stretched from Ferry Way to the land

granted in 1679 to Nathaniel Clark over which way 11 is alleged to have run. It thus included the land over which ways 9 and 10 are alleged to have run. As is obvious, the grant reserved no right of passage for the public over the land granted. Nor does any of the 1764, 1805 or 1872 reports to the town on the condition of the public landings and ways to the waterfront indicate the existence of any way in the area where ways 9 and 10 are alleged to have run.

The record does include an 1813 deed describing the conveyed land as "adjoining on a way [apparently in the approximate location of alleged way 9] leading from Water Street twenty feet wide at the entrance thereof," but there is no indication of the nature of this way.

(h) Way 11 (Custom House Way and Landing). "At a Legall Meeting of the Towne and freemen March 1st 1679 Nathaniel Clark proposed for a parcell of flatts uppon the southeast side of Capt. Whites grant . . . about three rods broad at Highwater Mark and so to Low Water Mark. This proposition was voted and granted but the Inhabitants of the Towne shall have free liberty to land goods uppon it provided they do not damnify the owner of the sd. wharfe . . . ." A later entry in the proprietors' records states, "According to the town grant above said we have laid out unto Nathaniel Clark a parcel of land for him to build a wharff by Merrimack River"; this parcel was described as stretching approximately from high water to low water and lying immediately to the east of the grant to Captain White. The 1805 report of a committee appointed by the town meeting to study the situation of the landings indicates that a "landing" on the upper side of the Custom House (way 11) was laid out in 1722 and was twenty feet wide at Water Street and thirty feet wide at the low water mark.

We now turn to the post 1869 history of the locus. By 1870 Newburyport's seaport activities had practically come to a close. By St. 1869, c. 398, § 2, the Legislature authorized the Newburyport City Railroad Company to construct and operate a railroad from a convenient point on the Newburyport Railroad or the Eastern Railroad "to some conven-

ient point, within the limits of Newburyport, upon the shore of Merrimac River, at tide-water." Section 8 of that act provided that "[t]he location of the tracks through the streets of Newburyport . . . shall be determined by the mayor and aldermen . . . ." See also St. 1870, c. 357. The railroad, as constructed, ran along the waterfront from a point east of the locus to Market Landing, where it ter-minated. There was extensive filling of the flats between and to the northerly of the docks to the easterly of and including Market Landing during the course of construction. According to Currier, History of Newburyport 365 (1906), the railroad was completed in July of 1872.

By St. 1873, c. 136, the Legislature authorized the city of Newburyport "to discontinue all the common landing-places, known as town and public landings" on the locus from Market Landing east (in other words, where the railroad had been built). The record before us does not disclose whether the city took any official action to discontinue those landing places. However, we do know that the construction of the railroad separated certain of those landing places from the Merrimack River. Further, on July 31, 1873, the Board of Harbor Commissioners granted a license to the Philadelphia and Reading Coal and Iron Company (Philadelphia) to extend its wharf into the Merrimack River in an area lying within the locus immediately to the north of the location of the railroad. Philadelphia constructed a coal pocket across a number of the ways to the waterfront. A portion of the coal pocket was on stilts, with the result that people could walk under it to the waterfront. It burned in 1928 and was thereafter razed.

By St. 1889, c. 247, § 1, the Legislature authorized the city to "discontinue all the common landing-places, known as town and public landings" on the locus west of Market Landing and "to fill up, use and improve the flats where said landing-places now are." The record does not disclose whether the city took any official action to discontinue the landing places pursuant to this authorization. However, on October 17, 1889, the Board of Harbor Commissioners

granted a license to the Boston and Maine Railroad to build a bulkhead and fill in a dock in an area west of the Philadelphia property, and by 1896 areas between the wharves west of the Market Landing had been filled in.

There is no evidence that the city or any governmental body ever took any action to extend to the river the various ways which had been created prior to 1869. There was ambiguous testimony to the effect that some of the alleged ways were used by vehicular and pedestrian traffic proceedings to and from businesses located in buildings adjacent to the ways or to and from the waterfront for recreational purposes. The only such evidence which need be summarized for present purposes is that concerning alleged ways 2, 9 and 10. One witness testified, apparently with respect to way 2, that in the 1920's the public "used to go right down there and run all their trucks down through there and get the lumber off the buildings"; this witness also remembered swimming with some friends in the same area. Another witness testified that in the 1940's and 1950's a building housing a furniture store blocked off alleged way 2. By 1972 that way was at best a narrow dirt path leading to the water; in the words of a witness, "I observed some dead weeds or other objects that showed evidence, that appeared to me to be trampled upon." Alleged ways 9 and 10 were blocked off by the coal pocket until it burned in 1928. A witness testified that there had been a furniture store in the vicinity and that people could walk by that building to the water; "If you felt like walking there, you'd just go . . . Just walked over the railroad tracks and just walked through [the coal pocket], no problem." Another witness testified that in 1972 in the vicinity of alleged way 9 "[t]here was evidence of the compression of soil and foot marks over a substantial area. I do not know if I would identify it as a path. It is not as if the foot marks were in one narrow place. They were extended over space." He gave similar testimony concerning alleged way 10; and further testified that at the northerly ends of both alleged ways 9 and 10 there was evidence of tire tracks where vehicles had driven

along the waterfront from ways 5 and 6. Cars parked by the water, and people picnicked.

The only other way whose history after 1869 requires specific discussion is alleged way 1. Statute 1889, c. 247, § 2, had required that "[t]he public landing-place situated opposite the foot of Green street . . . shall be used and improved only as a public park." On June 3, 1889, the mayor and aldermen ordered that the park be designated as Riverside Park. In the 1930's or 1940's fill was placed to the north of Riverside Park, thereby expanding it. After 1945 it was used primarily for parking cars, although there were benches on which people could sit; there was a float in the river at which pleasure craft could tie up.

By St. 1960, c. 94, the Legislature authorized Newburyport "by a vote of the city council with the approval of its mayor, [to] use for such municipal purposes as it may from time to time determine, all or any portion of the land held by said city for park purposes and known as Riverside Park." On April 4, 1960, the city council voted to accept St. 1960, c. 94. On June 4, 1962, the council enacted regulations governing the "Riverside Municipal Parking Lot." On November 13, 1967, the council voted that the city should sell Riverside Park to the authority and authorized the mayor to execute the necessary deed, which was done on November 20, 1967.

Further facts will appear as necessary.

2. The committee attacks on numerous grounds the validity of the city council's March 28, 1977, order discontinuing "any and all public rights in any and all portions of streets, highways, ways or landings" lying within the locus.

(a) The committee contends that the order of discontinuance of the ways was invalid because the order was adopted without compliance with the notice requirements contained in G. L. c. 82, §§ 1, 3 and 17, which are applicable to highways. This argument is without merit because the alleged ways, to the extent that they existed, were not highways, but town ways whose discontinuance was governed by

G. L. c. 82, § 21, which contains no notice requirements.[8] The distinction between highways and town ways, which has existed since at least 1639, lies in the fact that the former are and have been laid out under G. L. c. 82, § 1, or its statutory predecessors, while the latter are and have been laid out under G. L. c. 82, § 21, or its predecessors. During the period with which we are concerned the predecessors of § 1 provided for the laying out of highways by authorities having jurisdiction throughout a county, while the predecessors of § 21 provided for the laying out of town ways by a board of selectmen with the approval of the town meeting.[9] *Butchers' Slaughtering & Melting Assn.* v. *Boston,* 139 Mass. 290, 291-292 (1885). Nothing in the evidence suggests that any of the alleged ways was laid out under a predecessor of G. L. c. 82, § 1. To the contrary, all the evidence is that during a period extending up to 1834 the selectmen and the town meeting took steps pursuant to predecessors of G. L. c. 82, § 21, to lay out and accept as town ways the portions of alleged ways 1, 3 through 8 and 11 which ran from Merrimac Street or Water Street to the natural low water mark.

The selectmen, however, lacked jurisdiction to lay out town ways below high water in the absence of legislative authorization (*Kean* v. *Stetson,* 5 Pick. 492, 494-495 [1827]; *Commonwealth* v. *Roxbury,* 9 Gray 451, 494

---

[8] Prior to the insertion of G. L. c. 88, §§ 14 et seq., by St. 1908, c. 606, towns could not discontinue common landing places without legislative authorization (*Commonwealth* v. *Roxbury,* 9 Gray 451, 527 [1857]), and a way necessary to furnish access to such a landing place or otherwise appurtenant to it could not be discontinued without legislative authorization. *Bennett* v. *Clemence,* 6 Allen 10, 18 (1863). We need not consider whether G. L. c. 88, § 17, authorized the discontinuance without further legislative authorization of common landing places and appurtenant ways laid out prior to 1908 (see *Cape Cod S.S. Co.* v. *Selectmen of Provincetown,* 295 Mass. 65, 67, 68 [1936]) because the Legislature expressly authorized the discontinuance of all the landing places within the locus by St. 1873, c. 136, and St. 1889, c. 247.

[9] It will be remembered that Newburyport was a town until 1851. See note 3, *supra.*

[1857]; *Boston* v. *Richardson,* 105 Mass. 351, 364-365 [1870]; *N. Ward Co.* v. *Street Commrs. of Boston,* 217 Mass. 381, 384 [1914]) unless the town itself owned the flats, in which case the town had the same right to reclaim its flats which other riparian owners had. *Richardson* v. *Boston,* 60 U.S. (19 How.) 263, 269 (1856). There having been no legislative authorization for Newbury or Newburyport to lay out ways below high water, it follows that those portions of alleged ways 1, 3 through 8 and 11 lying on flats below high water not owned by the town became public ways, if at all, only by prescription, initiated by the town's efforts to lay out or widen the portions of those ways which lay below high water. However, such ways would have continued to be town ways rather than public highways. See *Commonwealth* v. *Belding,* 13 Met. 10, 15-16 (1847); *Avery* v. *Stewart,* 1 Cush. 496, 501 (1848); *Reed* v. *Mayo,* 220 Mass. 565, 567, 568 (1915). Contrast *Commonwealth* v. *Newbury,* 2 Pick. 51, 57 (1823), and *Commonwealth* v. *Low,* 3 Pick. 408, 413 (1826), in neither of which was there any evidence of an attempted layout by the selectmen.[10]

We reject all the committee's various arguments to the effect that the alleged ways, even if they began as town ways, were thereafter transformed into highways. Most of the arguments are grounded on the misconception that town ways are open only to town residents. In point of law, town ways are open equally to all members of the general public, residents and nonresidents alike. *Butchers' Slaughtering & Melting Assn.* v. *Boston,* 139 Mass. at 291. *Walker* v. *Medford,* 272 Mass. 161, 163 (1930). For example, the committee asserts that use of the alleged ways by nonresidents of the town under a claim of right for over twenty years transformed the town ways into highways by prescription. This contention was raised and rejected in *Coakley* v. *Boston & Maine R.R.,* 159 Mass. 32, 35 (1893), with the statement: "All the public have the right to use town ways at their

---

[10] The committee has not advanced any contention that the town ever acquired prescriptive rights in any portion of ways 1, 3 through 8 or 11.

pleasure; and the exercise of this right cannot change the nature of the way, or withdraw it from the jurisdiction of the town." Nor did the subdivision of the original Newbury into the present Newbury, West Newbury and Newbury-port transform the alleged ways into highways. See *Butchers' Slaughtering & Melting Assn.* v. *Boston,* 139 Mass. at 292-293, holding that a town way laid out by the Cambridge selectmen became a town way of Brighton when that town was carved out of Cambridge. Similarly, the fact that the proprietors' 1826 conveyance of Market Landing to the town provided that way 6 was to "be kept open . . . forever" was not inconsistent with that way's being a town way. The argument that all the ways must have become highways upon the acceptance of the Market Square Historic District for inclusion in the National Register of Historic Places because sites so included must be open to all, suffers from the same misconception as to the use of town ways, as does the argument that the authority's acceptance of a grant from the Bureau of Outdoor Recreation of the United States Department of Interior must have transformed the town ways into highways because otherwise there would be a violation of the prohibition of "discrimination on the basis of residence" contained in 16 U.S.C. § 4601-8(f)(8) (1976), which is applicable to projects funded by such grants. A final argument suffering from this misconception is the one that Governor Andros' 1687 grant of the right to operate a ferry from the foot of way 8 must have transformed that way into a highway because the ferry must have been open to all, regardless of residence.

The committee's argument that ways 3 and 4 (Central Wharf) must have been highways because the town meeting voted to give the proprietors of that wharf permission to improve the entrance of the wharf "as a public highway," and because the committee appointed to lay out the way reported back that they had laid out the entrance to Central Wharf "as a public highway," is also without merit. The town meeting had no jurisdiction to authorize the laying out of a highway and so must have intended to authorize and

accept the layout of a town way. *Butchers' Slaughtering & Melting Assn.* v. *Boston*, 139 Mass. at 293.

As alleged ways 1, 3 through 8 and 11 were town ways, they were properly discontinued without the giving of prior notice under G. L. c. 82, §§ 1, 3 and 17. There being no provision either in the Newburyport city charter (see St. 1851, c. 296; St. 1895, c. 266; and St. 1899, c. 101, to the extent they remain effective pursuant to G. L. c. 43, § 5, *Furlong* v. *Ayers*, 305 Mass. 455, 458 [1940], and G. L. c. 43, §§ 56 et seq., governing the Plan B form of city government adopted by Newburyport) or in the Newburyport code of ordinances prescribing the manner in which the city council is to exercise its power to discontinue town ways, that power must be exercised in accordance with the regulations prescribed by the General Laws relative to the discontinuance of town ways, so far as those regulations are applicable to a city. *Poor* v. *Blake*, 123 Mass. 543, 544 (1878). See *Barnes* v. *Springfield*, 4 Allen 488, 489 (1862). General Laws c. 82, § 21, contains no requirement that a city council give prior notice to anyone of its intent to order the discontinuance of a town way.[11] See *Bigelow* v. *City Council of Worcester*, 169 Mass. 390, 392 (1897), construing Pub. Sts. (1882) c. 49, § 66, a predecessor of G. L. c. 82, § 21.

Nor is there any constitutional requirement that a city council give notice of its intention to discontinue a town way or hold a hearing before doing so. The question whether to discontinue a town way is political or legislative rather than adjudicatory. *Hayeck* v. *Metropolitan Dist. Commn.*, 335 Mass. 372, 374-375 (1957). *Bailey* v. *Board of Appeals of Holden*, 370 Mass. 95, 96-97 (1976). See also *Dubois* v. *Selectmen of Dartmouth*, 2 Mass. App. Ct. 674, 677-678 (1974). We are not here concerned with the question whether those who may have been damaged by the order of discontinuance need be given an opportunity to be

---

[11] General Laws c. 82, § 22, does not apply to cities. In any event, the notice requirements therein set forth apply only to the laying out, relocation or alteration of a town way, not to the discontinuance of such a way. Hardy, Municipal Law and Practice § 534, at n.20 (1971).

heard on the question of compensation. See *Appleton* v. *Newton*, 178 Mass. 276, 281 (1901).

There has been no showing that any of the remaining alleged ways (2, 9 and 10) was ever a public way of any sort. There is no evidence that any public authority ever laid out any of those ways (or any portion thereof) as either a town way or a highway. *W.D. Cowls, Inc.* v. *Woicekoski*, 7 Mass. App. Ct. 18, 20 (1979). Nor was there evidence sufficient to warrant a finding that any of those ways became public by dedication prior to St. 1846, c. 203, § 1 (*Loriol* v. *Keene*, 343 Mass. 358, 360-361 [1961]), because there was no evidence other than use by the public to show acceptance by any public authority. While use by the public has some tendency to show acceptance, "mere user by the public is not sufficient." *Hayden* v. *Stone*, 112 Mass. 346, 350 (1873). Neither the 1764 report nor the 1805 report on the conditions of the ways to the waterfront mentioned any of alleged ways 2, 9 or 10. There was no evidence that any of those ways was ever maintained by any public authority. *W.D. Cowls, Inc.* v. *Woicekoski*, 7 Mass. App. Ct. at 20. Contrast *Clark* v. *Hull*, 184 Mass. 164, 165-166 (1903).

In addition, the evidence was insufficient to warrant a finding that any of those alleged ways ever became a public way by prescription. It is undisputed that portions of all three ways were blocked by buildings for long periods of time. See *Harvey* v. *Sandwich*, 256 Mass. 379, 386 (1926). The evidence that portions of those ways were used as access to businesses is insufficient to warrant a finding of prescription because there is nothing to show that those who made such use of the ways did so under a claim of right rather than at the invitation or with the permission of the owners. *Bullukian* v. *Franklin*, 248 Mass. 151, 155 (1924). *Teague* v. *Boston*, 278 Mass. 305, 308 (1932). See *Harvey* v. *Sandwich*, 256 Mass. at 385-386, and *Gower* v. *Saugus*, 315 Mass. 677, 681-682 (1944). "That there was continued use by the public for more than twenty years does not in itself

raise a presumption that such use was adverse."[12] *Box-borough* v. *Joatham Spring Realty Trust*, 356 Mass. 487, 490 (1969). The evidence of the use of ways 2, 9 and 10 to reach the waterfront for recreational purposes shows at best a use so "sparse and spotty" as to be insignificant. *Box-borough* v. *Joatham Spring Realty Trust*, 356 Mass. at 490. *Gower* v. *Saugus*, 315 Mass. at 682. *W.D. Cowls, Inc.* v. *Woicekoski*, 7 Mass. App. Ct. at 20. Contrast *White* v. *Boston Gear Works, Inc.*, 315 Mass. 496, 498-499 (1944). The evidence indicated that most of those who picnicked in or otherwise made recreational use of the area along the waterfront at the northerly ends of ways 9 and 10 got there by proceeding through ways 5 and 6 and then driving or walking laterally along the waterfront.

Finally, the various deeds in evidence referring to "ways" in the vicinity of alleged ways 2, 9 and 10 do not tend to show that those "ways" were public ways because the references to "ways" are as consistent with the ways' having been private ways over which use by the public was permissive and could be discontinued at the will of the owner (*Opinion of the Justices*, 313 Mass. 779, 785 [1943]; *W.D. Cowls, Inc.* v. *Woicekoski*, 7 Mass. App. Ct. at 19-20) as with their having been public ways. See *Commonwealth* v. *Gammons*, 23 Pick. 201, 203-204 (1839), and *Fenn* v. *Middleborough*, 7 Mass. App. Ct. 80, 87 (1979). Contrast *Reed* v. *Mayo*, 220 Mass. 565, 567 (1915).

(b) The committee asserts that the proprietors' 1751 grant of Somerby Landing Place and their 1826 grant to the town of their remaining interests in land in Newburyport created enforceable trusts to keep open and maintain way 1 and the landing at Somerby Landing Place and to keep open and maintain way 6 which cannot be impaired by the Legisla-

---

[12] *Bassett* v. *Harwich*, 180 Mass. 585, 586-587 (1902), which takes a contrary position, is no longer good authority in light of the fact that the later cases have consistently gone the other way. *Truc* v. *Field*, 269 Mass. 524, 528-529 (1930), is inapposite because it did not involve a public way, but rather a claim of right by a private individual. See *Fenn* v. *Middleborough*, 7 Mass. App. Ct. 80, 84-85 (1979).

ture and that the order of discontinuance was therefore invalid as applied to that landing and those ways. We agree that the two grants created enforceable trusts as to those portions of ways 1 and 6 which were so conveyed to the towns.

The proprietors owned their lands as tenants in common. *Ipswich* v. *Proprietors of Jeffries Neck Pasture,* 218 Mass. 487, 490 (1914). *Bates* v. *Cohasset,* 280 Mass. 142, 148 (1932). They "had authority to alien their lands by votes; and such votes, when duly proved by record or otherwise . . . raise a presumption that the proprietors had sufficient seisin of the premises to enable them to convey, and to vest the legal seisin in the grantee." *Adams* v. *Hannah,* 261 Mass. 125, 129 (1927), and cases cited. The proprietors' authority to alien their lands included the authority to grant land to the towns to be held in trust for the use and benefit of their inhabitants (*Green* v. *Putnam,* 8 Cush. 21, 27-28 [1851]; *Wrentham* v. *Norfolk,* 114 Mass. 555, 556-557, 561-562 [1874]) in perpetuity (see *Wellington, petitioner,* 16 Pick. 87, 98-101 [1834], *Howe* v. *Lowell,* 171 Mass. 575, 581-582 [1898]). It is settled that "[l]and may be granted upon a trust to maintain a highway or boulevard in perpetuity . . . [and] such trusts when accepted must be sacredly observed and executed." *MacDonald* v. *Street Commrs. of Boston,* 268 Mass. 288, 296 (1929).

Whether such trusts were created by the two conveyances in question is a matter of interpreting each instrument as a whole in light of the attendant circumstances in order to determine the proprietors' intent. *Green* v. *Putnam,* 8 Cush. at 25-26. *Nickols* v. *Commissioners of Middlesex County,* 341 Mass. 13, 19 (1960). A mere statement in a grant of the use to which the grantee contemplates putting the granted premises or of the purpose for which the grant is made is insufficient to create an enforceable trust. *MacDonald* v. *Street Commrs. of Boston,* 268 Mass. at 294-297. *Loomis* v. *Boston,* 331 Mass. 129, 132 (1954). *Wakefield* v. *Attorney Gen.* 334 Mass. 632, 636 (1956). *Opinion of the Justices,* 369 Mass. 979, 985 (1975). Here,

however, in both grants the proprietors went further and stated that the granted lands were to be used for the stated purposes "forever." The proprietors thus "expressed an intent in plain words to create a trust in perpetuity of the subject parcel[s]." *Opinion of the Justices*, 369 Mass. at 985. *Salem* v. *Attorney Gen.*, 344 Mass. 626, 629-631 (1962). *Dunphy* v. *Commonwealth*, 368 Mass. 376, 383 (1975). When Newbury and Newburyport accepted the grants, contracts were formed between the grantors and the grantees which had to be observed and which the Legislature could not impair by statute. *Salem* v. *Attorney Gen.*, 344 Mass. at 631. *Opinion of the Justices*, 369 Mass. at 983. The cases of *Packard* v. *Ames*, 16 Gray 327, 329 (1860), *Rawson* v. *School Dist. in Uxbridge*, 7 Allen 125, 129-131 (1863), *Sohier* v. *Trinity Church*, 109 Mass. 1, 19 (1871), and *Barker* v. *Barrows*, 138 Mass. 578, 579-580 (1885), are inapposite because they involved the question whether deeds contained conditions subsequent rather than enforceable trusts.[13] The cases of *Attorney Gen.* v. *Tarr*, 148 Mass. 309, 311-313 (1889), relied on by the trial judge, and *Hartshorn* v. *South Reading*, 3 Allen 501, 506 (1862), are also inapposite because they involved dedications of certain town lands to public uses by the towns themselves rather than deeds from proprietors to the towns. See *Lowell* v. *Boston*, 322 Mass. 709, 726-730 (1948). We conclude that the order of discontinuance was invalid as it relates to those portions of alleged ways 1 and 6 which are subject to the trust. Obviously, however, the only portions of those alleged ways which are subject to trusts are those portions which were conveyed to the towns by the proprietors. The case will be remanded to the Land Court to determine just what portions of alleged ways 1 and 6 were so conveyed to the towns and where those portions are located on the ground. The decree of confirmation is to contain appropriate provisions

---

[13] Indeed, the existence of a condition that property revert to the proprietors if not used for specified purposes is inconsistent with an intent to create a public trust in perpetuity. *Opinion of the Justices*, 369 Mass. at 984-985.

requiring those portions to be kept open for the purposes and in accordance with the terms of the respective grants from the proprietors.

With respect to Somerby Landing Place (or at least that portion subject to the 1751 grant), it is appropriate to make the following observation. As a result of the trust created in 1751, the Legislature lacked the authority to authorize its discontinuance by St. 1889, c. 247, and the city council lacked the authority to adopt an order of discontinuance concerning it. However, the proprietors could not by their grant deprive the Commonwealth of its right to make such use of its adjoining tidelands as it might see fit (*Charlestown* v. *County Commrs. of Middlesex,* 3 Met. 202, 203, 205-206 [1841]; *Attorney Gen.* v. *Woods,* 108 Mass. 436, 440 [1871]; *Boston Waterfront Dev. Corp.* v. *Commonwealth,* 378 Mass. 629, 636-637 [1979]), and the Commonwealth, by authorizing the filling of those tidelands, could physically separate that portion of Somerby Landing Place which was subject to the trust from the Merrimack River, thus effectively ending the use of the entire area as a landing place. It appears from the record that fill has been placed on the Commonwealth's tidelands, but it does not appear by whose authority. We need not further consider the legal issues arising from the placement of such fill because none has been raised or argued. However, the Land Court is to determine the location on the ground of that portion of Somerby Landing Place which was conveyed by the 1751 grant of the proprietors and which is not included within the limits of way 1, and the decree of confirmation is to include appropriate provisions with respect to that portion which will protect and perpetuate the terms of the grant from the proprietors.

(c) The town's grants from 1678 to 1680 of the parcels over which were located the southerly portions of alleged ways 3, 4, 8 and 11 to individuals proposing to construct wharves on those parcels reserved for the town's inhabitants the right to land goods on those wharves, subject to certain conditions. The committee, characterizing those reserved

rights as "Liberties of the Town," contends that the grants reserving them created enforceable trusts under which those four ways must be kept open in perpetuity and, therefore, that the order of discontinuance is invalid as applied to those ways. This contention is without merit. It should first be observed that the grants here in question differ from those considered in part 2(b) of this opinion in that the town was the grantor rather than the grantee. Only one of the four grants (that relating to way 8) indicated that the right to land goods reserved therein was to be perpetual. Even assuming, however, that the reservations set forth in all four grants constituted dedications of the subject land for the purpose of landing goods by the public which the city could not revoke on its own initiative (but see *Hartshorn* v. *South Reading*, 3 Allen at 506), the Legislature could authorize their revocation (*Lowell* v. *Boston*, 322 Mass. at 730) and did so by St. 1873, c. 136, and St. 1889, c. 247, § 1.

(d) Citing art. 49 of the Amendments to the Massachusetts Constitution, as amended by art. 97 of the Amendments, the committee contends that the order of discontinuance was invalid because the Legislature had not authorized the order by a two-thirds roll call vote of both houses. Article 49, as so amended, provides that the "people shall have the right to clean air and water . . . and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose." Article 49 further provides, "Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court." The committee's contention is without merit.

In order for the two-thirds vote requirement of art. 49 to come into play the lands or easements being disposed of must have been "taken or acquired" for the stated purposes, namely "the protection of the people in their right to the

conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources." Rep. A.G., Pub. Doc. No. 12, at 158 (1976). It is clear that ways 1, 3 through 8 and 11, as originally laid out, were created for the purposes of providing access to the public landing places located at the foot of each way and moving goods to and from ships visiting Newburyport (see *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 6 Mass. App. Ct. 214, 221-222 [1978], *S.C.*, 378 Mass. 629 [1979]). Even if we assume[14] that the ways were thus "taken or acquired for" the "development and utilization of . . . water . . . resources" (see *Opinion of the Justices*, 237 Mass. 598, 609-610, 612 [1921]), the fact remains that all nine of those ways had ceased to be used for such purposes[15] long before the amendment of art. 49 by reason of the Legislature's enactment of St. 1873, c. 136, and St. 1889, c. 247, which cumulatively authorized the discontinuance of all the landing places in the locus and by reason of the subsequent filling of the tidelands immediately to the north of the old landing places. That being the case, art. 49 had no applicability in the present circumstances. See *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 588-560 (1965). The committee's reference to the fact that the ways provide access to National Register Historic Districts and pass over "National Register-eligible archaeological resources" does not assist it; the ways were not "taken or acquired" for either of those purposes.

(e) The committee also contends, as best we can make out its argument, that the order of discontinuance was invalid because the city failed to notify and consult with the Advisory Council on Historic Preservation established under

---

[14] We also assume (without deciding) that art. 49 applies to "[l]ands and easements taken or acquired" prior to, as well as after, the November 7, 1972, effective date of the amendment. See Rep. A.G., Pub. Doc. No. 12, at 140-141 (1973).

[15] Way 1 is a possible exception, but, as discussed in part 2(b) of this opinion, the order of discontinuance was invalid with respect to the portion of way 1 which was included in the 1751 grant from the proprietors.

16 U.S.C. § 470i (1976) before adopting the order. The facts relevant to this contention may be stated as follows. The authority entered into a "Loan and Capital Grant Contract" with the Department of Housing and Urban Development (HUD) in August, 1966 (amended on September 26, 1969), by which the United States agreed to extend to the authority "certain Federal financial assistance under Title I of the Housing Act of 1949, as amended," in connection with the carrying out of the authority's project. On February 25, 1971, the United States Custom House building, which lies along the easterly boundary of the locus, was accepted for inclusion in the National Register of Historic Places, and on the same date the Market Square Historic District, which includes the southeasterly portion of the locus, was similarly accepted for inclusion on the Register.

On some undisclosed date thereafter HUD, apparently pursuant to 16 U.S.C. § 470f (1976) (§ 106 of the National Historic Preservation Act of 1966),[16] but perhaps pursuant to 42 U.S.C. § 4332(2)(C) (1976) (§ 102[2][C] of the National Environmental Policy Act of 1969), requested the Advisory Council to comment on the effect of the authority's urban renewal plan on the custom house and on the Market Square Historic District. The Advisory Council consulted with State and "local officials." Its executive director prepared a report on the effect of the urban renewal project which he filed with the Advisory Council. According to his testimony, his report found several adverse effects; "one thread that ran throughout was the interruption of the tra-

---

[16] 16 U.S.C. § 470f (1976) reads: "The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking."

ditional avenues of movements of people and goods in and out of the seaport area." The Advisory Council "spoke to the Secretary of [HUD] . . . and he observed, honored their counsel, their advice, their recommendations, and the plan did, in fact, become one that was more felicitous towards the historic district."

The committee's contention as to the invalidity of the order of discontinuance necessarily rests upon the premise that the opportunity to comment thus given the Advisory Council by HUD was insufficient and that the city (or the authority) should have given the Advisory Council a second opportunity to comment at the time of the adoption of the order of discontinuance. Any such obligation must rest on 24 C.F.R. §§ 58.24 and 570.604 (1977),[17] which require

---

[17] Section 58.24 reads as follows: "Applicants must comply with the following requirements relating to the Preservation of Historic and Archeological Data Act of 1974, Section 106 of the National Historic Preservation Act of 1966 and Executive Order 11593 whenever any property or district included in, or found by the Secretary of the Interior pursuant to 36 CFR Part 800 to be eligible for inclusion in, the National Register provided for by such Act, is in the boundaries, or within the vicinity of, a project which is to be funded, in whole or in part, by Title I funds.

"(a) As part of the environmental review process each project shall be examined in accordance with the Procedures for Protection of Historic and Cultural Properties (36 CFR Part 800) for the purpose of identifying any National Register and National Register-eligible properties and determining whether or not the project may affect the property. If the property is not affected by the project, the applicant shall so state, in the environmental review record.

"(b) If the project will affect the property, the applicant, as part of the environmental review process, shall carry out the procedures set forth at 36 CFR Part 800."

Section 570.604 reads as follows: "Recipients must take into account the effect of a project on any district, site, building, structure, or object listed in or found by the Secretary of the Interior, pursuant to 34 CFR Part 800, to be eligible for inclusion in the National Register of Historic Places, maintained by the National Park Service of the U.S. Department of the Interior. Recipients should make every effort to eliminate or minimize any adverse effect on a historic property. Activities affecting such properties will be subject to requirements set forth in § 570.603. Recipients must meet the historic preservation requirements of P.L. 89-665 and the Archeological and Historic Preservation Act of 1974 (Pub. L.

applicants for and recipients of funds under the Community Development Program (into which Title I of the Housing Act of 1949 was consolidated in 1974 by 42 U.S.C §§ 5301 et seq., see 1974 U.S. Code Cong. & Ad. News 4318), rather than the Secretary of HUD, to carry out the procedures set out in 36 C.F.R. §§ 800.1 et seq. (1976), which comprise the Advisory Council's implementing regulations under 16 U.S.C. § 470f (1976), with the applicant or recipient acting as the "Agency Official" mentioned in those regulations.[18] It seems unlikely that those regulations would be interpreted as requiring that the city or the authority again consult with the Ad-

---

93-291), and Executive Order 11593, including the procedures prescribed by the Advisory Council on Historic Preservation in 36 CFR Part 800."

Section 58.3 of 24 C.F.R., in defining "applicant," states, "Upon execution of its grant agreement with HUD an applicant becomes a 'recipient' under 24 CFR Part 570. As used in this Part 58, the term 'applicant' includes 'recipient' under Part 570, where the context so requires."

[18] As the trial judge observed in his decision, 16 U.S.C. § 470f (1976) by its terms is applicable only to the "head of any *Federal* agency" (emphasis supplied). However, by § 104(h)(1) of the Housing and Community Development Act of 1974 (42 U.S.C. § 5304[h][1] [1976]), Congress stated that the Secretary of HUD, "in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to applicants who assume all of the responsibilities for environmental review, decisionmaking, and action pursuant to [the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq.] that would apply to the Secretary were he to undertake such projects as Federal projects." Section 104(h)(3)(D)(i) (42 U.S.C. § 5304[h][3][D][i] [1976]) of the statute further requires the recipient of Federal funds "to assume the status of a responsible Federal official under the National Enviromental Policy Act of 1969." See *Monarch Chem. Works, Inc.* v. *Exon,* 466 F. Supp. 639, 645-646 (D. Neb. 1979). In 1975 HUD issued both 24 C.F.R. Parts 58 and 570 pursuant to this authorization. See 24 C.F.R. §§ 58.1(a)(2) and 570.1(a). Although § 104(h)(1) of the Housing and Community Development Act of 1974 refers only to the National Environmental Policy Act of 1969 and not to the Historic Preservation Act of 1966, which inserted 16 U.S.C. § 470f, it is apparent from 24 C.F.R. §§ 58.24 and 570.604 that HUD interpreted § 104(h)(1) as authorizing it to delegate to applicants for, or recipients of, Federal funds its responsibilities under 16 U.S.C. § 470f (1976) and its implementing regulations, 36 C.F.R., §§ 800.1 et seq. Thus, the obligations imposed on the authority by 24 C.F.R., §§ 58.24 and 570.604, assuming those regulations to be valid, must be seen as arising under the National Environmental Policy Act of 1969. See 42 U.S.C. § 4331(b)(4) (1976).

visory Council in the absence, as here, of any allegation of a significant change in the circumstances since the Secretary of HUD had first consulted with the Advisory Council. See 24 C.F.R. § 58.19(c) (1977) and *Central Oklahoma Preservation Alliance* v. *Oklahoma City Urban Renewal Authy.*, 471 F. Supp. 68, 82, 83-84 (W.D. Okla. 1979). Further, in light of the Secretary's unquestioned compliance with 16 U.S.C. § 470f (1976) and the facts that experts on historic properties had had an opportunity to comment on the effects of discontinuing the ways and that there had been no change in circumstances since that opportunity had been afforded, it seems unlikely that any injunctive relief could have been obtained in a Federal court (see 42 U.S.C. § 5304[h][2][D][ii] [1976] and *Save the Courthouse Comm.* v. *Lynn*, 408 F. Supp. 1323, 1344 [S.D.N.Y. 1975]) against the order of discontinuance, even assuming a violation of the implementing regulations could have been shown. *D.C. Federation of Civic Assns.* v. *Adams*, 571 F.2d 1310, 1313-1314 (4th Cir. 1978). *Cobble Hill Assn.* v. *Adams*, 470 F. Supp. 1077, 1090 n.9 (E.D. N.Y. 1979). In any event, it does not appear that any such relief was sought, and the failure, if any, to comply with Federal statutes and regulations did not "invalidate . . . [the city council's] statutory authority" to order the discontinuance of town ways. *Order of Friars Minor of the Province of the Most Holy Name* v. *Denver Urban Renewal Authy.*, 186 Colo. 367, 371 (1974).[19]

(f) Finally, the committee claims that the city was estopped from discontinuing the alleged ways as a result of certain remarks made by the executive director of the authority. On September 11, 1967, the authority held a public hearing with respect to the urban renewal project. At this hearing there was discussion of the authority's (anticipated) November 21, 1967, eminent domain taking of land lying outside the locus. The executive director said, "We

---

[19] We have assumed in this part of our opinion that the failure of a recipient of Federal funds to comply with relevant regulations can affect the title to the recipient's real estate. We expressly refrain from deciding that question.

will take the rights of ways but not the right of the public to pass on them." That statement was quoted in a local newspaper. The committee's argument apparently is that subsequent investors who purchased property from the authority within the locus were led by this statement to believe that the alleged ways involved in the present case would continue in existence. This contention is without merit. The trial judge found on ample evidence that the ways referred to by the executive director were all outside the locus and not the alleged ways involved in the present case.[20]

3. We consider now the committee's various contentions concerning the transfer to the authority pursuant to St. 1967, c. 702, § 2, of the Commonwealth's title to the "tidelands"[21] within the locus. It should first be noted, however, that the Supreme Judicial Court held in *Boston Waterfront Dev. Corp.* v. *Commonwealth,* 378 Mass. at 643, 646-649, that land below the natural low watermark can be granted by the Commonwealth only to fulfil a public purpose. The committee does not seriously contend that the transfer of these tidelands to the authority for inclusion in an urban renewal project was not for a public purpose. See *Opinion of the Justices,* 341 Mass. 760, 776-777 (1960); *Omartian* v. *Mayor of Springfield,* 354 Mass. 439, 442 n.3 (1968); *Opinion of the Justices,* 373 Mass. 904, 907 (1977); *Boston Edison Co.* v. *Boston Redev. Authy.,* 374 Mass. 37, 58-63 (1977). Nonetheless, it is clear from the *Boston Waterfront* case that the authority now holds the tidelands subject to the same limitations under which the Commonwealth held them. As was said in that case, land below the natural low watermark is "impressed with a public trust, which gives the public's representatives an interest

[20] In this part of our opinion we have passed the question whether the committee has the right to ride on the coattails of purchasers from the authority.

[21] As the owners of the uplands owned the fee to mean low water (up to 100 rods) by virtue of the Colony Ordinance of 1641-1647, we construe the word "tidelands" in this statute to mean the lands owned by the Commonwealth which lay below the natural mean low watermark.

and responsibility in its development" (378 Mass. at 649) which cannot be extinguished (378 Mass. at 643, 646-647). It follows that the authority can grant those tidelands to private individuals only for development for public purposes, such as those described in the *Boston Waterfront* case, 378 Mass. at 647-649, 654, and that any such grant must be subject to a condition subsequent that the tidelands be used for the purposes for which they are granted. *Id.* at 648, 649. Whether the authority's urban renewal plan involves a violation of this doctrine is not apparent from the present record. This problem is to be considered by the Land Court, and appropriate provisions for the protection of the public interest in the area below the natural low watermark, as it existed prior to the placement of any fill, are to be included in the decree of confirmation.[22]

(a) The committee's first contention is that St. 1967, c. 702, failed to indicate a Legislative awareness of the various public uses to which the Commonwealth's tidelands within the locus were then being put. It is of course true that "public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion" and that there must "appear in the legislation not only a statement of the new use but a statement or recital showing in some way legislative awareness of the existing public use." *Robbins* v. *Department of Pub. Works*, 355 Mass. 328, 330, 331 (1969). *Brookline* v. *Metropolitan Dist. Comm.*, 357 Mass. 435, 440-441 (1970). This rule, however applies only to lands actually "devoted to one public use." Implicit in this phrase is the notion of an appropriation of the land to a particular public use by some governmental body. Examples of such appropriations include "prior legislative authorization of a taking for a particular public purpose," acceptance of a "public or private grant restricted to a particular public

---

[22] We note that the Supreme Judicial Court had not released its opinion in the *Boston Waterfront* case by the time the trial judge rendered his decision in this case.

purpose," a "formal dedication" by a city or town of land for a particular public purpose, and the Legislature's identifying a type of area (such as a great pond) with, or restricting it to, a particular use. *Muir* v. *Leominster*, 2 Mass. App. Ct. 587, 591-592 & n.1 (1974).

Statute 1967, c. 702, § 1, identified the land to be transferred to the authority as all the Commonwealth's "tidelands" falling within a carefully defined area. The statute sufficiently indicated a legislative awareness that particular tidelands were being transferred. See *Robbins* v. *Department of Pub. Works*, 355 Mass. at 331 n.4; *Muir* v. *Leominster*, 2 Mass. App. Ct. at 592 n.1. Contrast *Sacco* v. *Department of Pub. Works*, 352 Mass. 670, 672-673 (1967).

The only other public use to which any portion of the locus has been appropriated or devoted was that of the various ways. It should first be noted that none of those ways appears to have lain within the Commonwealth's tidelands. If any of the ways did cross the tidelands, there was nothing in St. 1967, c. 702, that diverted it to another public use. All that was transferred was title to the tidelands. Any easements of travel taken by the town in order to create town ways were "wholly independent of the title in fee" (*Boston* v. *Richardson*, 105 Mass. 351, 365 [1870]; see *Boston* v. *A.W. Perry, Inc.* 304 Mass. 18, 20 [1939]), and thus those easements were not transferred from the Commonwealth to the authority under St. 1967, c. 702, § 2. The ways, to the extent they existed in 1967, survived until the 1977 order of discontinuance, which we have determined was authorized by G. L. c. 82, § 21.

(b) The committee also contends that because the purchase price the authority is to pay the Commonwealth has not been determined or paid as provided in St. 1967, c. 702, § 2, title has not yet passed to the authority and that the 1972 amendment of art. 49 of the Amendments to the Massachusetts Constitution now prevents the passage of title to the authority in the absence of a two-thirds vote of both Houses of the Legislature. The short answer to this contention is that by virtue of St. 1967, c. 702, § 2, title to the

Commonwealth's tidelands within the locus passed to the authority in 1969, well before the amendment of art. 49. See *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. at 558-560, holding that a similar amendment to the Constitution was not retroactive. Statute 1967, c. 702, § 2 provided that title to the Commonwealth's tidelands within the locus would vest in the authority "[o]n the thirtieth day after the execution under the Federal Housing Act of 1949, as amended, of a loan and grant contract" for an urban renewal project covering a defined area which included the entire locus or "on the thirtieth day after the effective date of this act, whichever date shall be the last to occur . . . provided, that within said applicable thirty day period, the Authority files in the . . . registry of deeds a certificate by the Authority that such contract has been so executed, and gives written notice of such filing to the" Department of Public Works. It is undisputed that on September 26, 1969, the loan and grant contract between the authority and HUD was amended to cover the entire area mentioned in St. 1967, c. 702, § 2, and that within thirty days thereafter the required certificate was filed and notice thereof sent to the Department of Public Works. Thus, the Commonwealth's title to the tidelands vested in the authority on October 26, 1969.

Statute 1967, c. 702, § 2, did further provide that "[u]pon receipt of notice of the filing of such certificate" the Department of Public Works was to "procure a title examination to determine the right, title and interest of the commonwealth in the area vesting in the Authority under this act and also a real estate expert to appraise the value of the same. The Authority shall pay the commonwealth for the right, title and interest so vesting such compensation as, after consideration of such appraisal, may be recommended by the department and determined by the governor to be just compensation therefor." But those requirements were not included in the express proviso as to what must happen within the specified thirty-day period before title should vest in the authority. To the contrary, the clear intent of St. 1967,

c. 702, § 2, was that title should vest in the authority at the conclusion of that period, regardless of whether the compensation had been paid by then.

(c) Statute 1967, c. 702, § 3, authorized the Department of Public Works to issue to the authority irrevocable licenses "to fill or maintain fill or to erect or maintain a structure" within the locus for a period extending from the date of the filing of the certificate provided for in § 2 through January 1, 1973. (In the absence of that authorization G. L. c. 91, § 15, would have prohibited the issuance of irrevocable licenses.) By St. 1972, c. 771, and St. 1974, c. 522, the period within which such licenses could be issued was extended until January 1, 1977. The committee asserts that those statutes were invalid because not enacted on two-thirds roll call votes of both Houses of the Legislature.

The contention is irrelevant to the issues of the present case. All the authority seeks to do in the present case is secure confirmation of its title to the locus. Section 2 of St. 1967, c. 702, transferred to the authority all the Commonwealth's title to tidelands and tidewaters within the locus. Statute 1972, c. 771, and St. 1974, c. 522, amended not § 2 but § 3 of St. 1967, c. 702, which concerned the authority's right to irrevocable licenses to place fill on the locus rather than its title to the locus. Section 3 of St. 1967, c. 702, represented an exercise of the Commonwealth's police power to regulate what the authority could do with the property; it did not transfer any property interest to the authority.

4. We now consider (a) the validity of St. 1960, c. 94, by which the Legislature provided that the city "may, by a vote of the city council with the approval of its mayor, use for such municipal purposes as it may from time to time determine, all or any portion of the land held by said city for park purposes and known as Riverside Park" and (b) the validity of the city's subsequent sale of Riverside Park to the authority. Before considering the committee's various contentions, it should be recalled that in part 2(b) of this opinion we determined that a portion of the property described

in St. 1960, c. 94, was granted to the then town of Newbury in 1751 subject to an enforceable public trust that it be used for a way and public landing place in perpetuity and that the Legislature lacked the power to impair the obligations of that trust. Riverside Park was created pursuant to St. 1889, c. 247, which, after authorizing the discontinuance of the landing places lying within the locus west of Market Square (§ 1), provided that "[t]he public landing-place situated opposite the foot of Green street . . . shall be used and improved only as a public park" (§ 2). Obviously, to the extent this statute could be interpreted as requiring the discontinuance of the way and public landing place created pursuant to the 1751 grant it was invalid. The following discussion is based on the assumption that a park could be laid out over the land granted in 1751 in a manner not inconsistent with continued use of that land as a way and public landing place and that, to that extent, St. 1889, c. 247, § 2, was not invalid. *Boston* v. *Brookline,* 156 Mass. 172, 175-176, 177 (1892). *Howe* v. *Lowell,* 171 Mass. at 582-583. *Eldredge* v. *County Commrs. of Norfolk,* 185 Mass. 186, 188 (1904). *Needham* v. *County Commrs. of Norfolk,* 324 Mass. 293, 296-297 (1949). Contrast *Sacco* v. *Department of Pub. Works,* 352 Mass. at 673.

(a) Contrary to the committee's contentions, the obvious intent of St. 1960, c. 94, was to authorize the city to discontinue Riverside Park and use the land for any municipal purpose it might choose, with the result that the land would no longer be appropriated to a particular public use. The Legislature had the authority to do that.[23] *Lowell* v. *Boston,* 322 Mass. at 730-731. *Loomis* v. *Boston,* 331 Mass. 129, 132 (1954). *Everett* v. *Metropolitan Dist. Commn.,* 350 Mass. 575, 578 (1966). It clearly identified the subject land by describing it as "Riverside Park" and explicitly indicated its awareness of the existing public use by describing the land as being "held by [the] city for park purposes." See

[23] Of course, the Legislature could not impair the trust to which the land is subject.

*Robbins* v. *Department of Pub. Works*, 355 Mass. at 331. Thus, Riverside Park ceased to exist as a park upon the city council's vote to create a parking lot covering its entire area.

(b) Because the park ceased to exist in 1960, the city's 1967 sale of the land where the park had been located did not violate either G. L. c. 44, § 63, or G. L. c. 79, § 5, which are applicable to land held for park purposes. Of course, the land remains subject to the trust created by the 1751 grant from the proprietors.

5. The committee asserts that certain exhibits and testimony it sought to have admitted in evidence were improperly excluded by the trial judge. The excluded exhibits were numbered 3, 4, 8, 11 and 25 for identification. All but 25 for identification (a copy of a judgment of the United States District Court for the District of Massachusetts) were maps or reports depicting or discussing the results of archaeological investigations of various areas within the locus and the impact of the authority's urban renewal project upon properties included on the National Register of Historic Places which had been prepared or conducted pursuant to a stipulation between the parties which was filed in the Federal court and pursuant to various Federal laws, including the Preservation of Historic and Archeological Data Act of 1974, 16 U.S.C. §§ 469 et seq. (1976), and the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq. (1976). The excluded testimony was that of a Dr. Stephanie Rodeffer, who would have testified to certain opinions based on the information collected in connection with the preparation of 3 and 4 for identification.

Quite apart from the question whether all this evidence constituted inadmissible hearsay, as the trial judge ruled, the committee was not harmed by any of the exclusions. *St. Germain & Son* v. *Taunton Redev. Authy.*, 4 Mass. App. Ct. 46, 53-54 (1976). *Burns* v. *Combined Ins. Co.*, 6 Mass. App. Ct. 86, 92 (1978). G. L. c. 231, §§ 119, 132. The committee argues that the excluded evidence would have tended to show the existence, use, and locations of the alleged ways. It also argues that the evidence was relevant

with respect to the issues it raised concerning art. 49 of the Massachusetts Constitution, as amended, because the evidence tended to show that the locus contained historic or archaeological resources. However, we have assumed the existence of all the alleged ways except 2, 9, and 10. With respect to those ways, there was nothing in the excluded evidence which would have supplied the missing link in the committee's proof of their existence, namely, that the use of those ways had been under a claim of right. Similarly, the excluded evidence would not have assisted the committee in any of its art. 49 contentions. As previously discussed, the two-thirds roll call vote requirement of art. 49 applies only to land or easements "taken or acquired" for the stated purposes. There is nothing in the excluded evidence which would have shown that any portion of the locus had ever been taken or acquired for the purpose of preserving the historic or archaeological resources contained therein.

6. The committee contends that certain of the judge's findings of fact were "clearly erroneous, plainly wrong, and usually both concurrently." The finding the committee primarily attacks is the one that the eleven alleged ways and Riverside Park had been abandoned prior to the adoption of the order of discontinuance. Because we have determined that the order of discontinuance was valid in any event (except with respect to portions of alleged ways 1 and 6), there is no need to consider the correctness of the finding of abandonment. The attack on the finding with respect to issues raised concerning art. 49, as amended, is answered by what has already been said elsewhere in this opinion.

7. There is no merit to the committee's contention that the judge should have disqualified himself because he had been a member of the House of Representatives when St. 1967, c. 702, was enacted. *Norton* v. *Lyon Van & Storage Co.*, 9 Cal. App. 2d 199, 204 (1935), cert. denied, 298 U.S. 662 (1936). As the validity of that statute was and is a pure question of law, the committee's reliance upon S.J.C. Rule 3:25, Canon 3(C)(1)(a), 359 Mass. 844 (1973), is misplaced.

8. Finally, the committee asserts that it is entitled to its costs, both at trial and on appeal, by reason of the stipulation between the parties which is referred to in part 5 hereof and by reason of the provisions of G. L. c. 187, § 4. All that stipulation said was: "The [committee] shall not be precluded in any forum from seeking legal fees. However, this provision shall in no respect restrict the right of any defendant to oppose the granting of such fees." This provision obviously gave the committee no right to recover any costs.[24] General Laws c. 187, § 4, applies only where a person seeking to prevent the acquisition of an easement by custom, use or otherwise gives public notice of his intention to prevent the acquisition of such easement, as provided in G. L. c. 187, § 3, and the person claiming the easement thereafter brings an action for the purpose of trying his right. There is no evidence that either the authority or the city ever gave such notice under § 3.

The awarding of costs at trial was in the discretion of the trial judge pursuant to G. L. c. 185, § 21, and G. L. c. 261, § 13. See *Creed* v. *Apog*, 377 Mass. 522, 526 (1979). No abuse of that discretion has been shown.

9. We have considered every contention of the committee which has been argued within the meaning of Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

The decision of the Land Court is vacated, and the case is remanded to that court for the further proceedings required by parts 2(b) and 3 of this opinion; costs of appeal are not to be awarded to any party.[25]

*So ordered.*

---

[24] If the committee disagrees with our interpretation of the stipulation, it is free to seek whatever relief may be available to it in the Federal court.

[25] See Mass. R.A.P. 26(a), as amended, 378 Mass. 925 (1979).